**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF TEXAS**

**MARSHALL DIVISION**

| | |
|---|---|
| HUAWEI TECHNOLOGIES CO. LTD.,<br><br>Plaintiff,<br><br>v.<br><br>T-MOBILE US, INC. and T-MOBILE USA, INC.,<br><br>Defendants. | Civil Action No. 2:16-cv-00055-JRG-RSP<br><br>**<u>Jury Trial Demanded</u>** |

**DEFENDANTS T-MOBILE US, INC. AND T-MOBILE USA, INC.'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO <u>HUAWEI TECHNOLOGIES CO. LTD.'S COMPLAINT</u>**

Defendants T-Mobile US, Inc. and T-Mobile USA, Inc. (collectively, "T-Mobile") file this Answer, Affirmative Defenses, and Counterclaims to Plaintiff Huawei Technologies Co. Ltd.'s Original Complaint for Patent Infringement ("Complaint"). Except as expressly admitted below, T-Mobile denies each and every allegation set forth in the Complaint. T-Mobile responds to the numbered paragraphs of the Complaint and prayer for relief as follows:

1. T-Mobile admits that Plaintiff Huawei Technologies Co. Ltd. ("Huawei") filed a Complaint for Patent Infringement against T-Mobile US, Inc. and T-Mobile USA, Inc.

## <u>NATURE OF ACTION</u>

2. T-Mobile is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 2 of the Complaint and, therefore, denies them.

3. T-Mobile is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 3 of the Complaint and, therefore, denies them.

4. T-Mobile is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 4 of the Complaint and, therefore, denies them.

5. T-Mobile is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 5 of the Complaint and, therefore, denies them.

6. T-Mobile is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 6 of the Complaint and, therefore, denies them.

7. T-Mobile is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 7 of the Complaint and, therefore, denies them.

8. T-Mobile is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 8 of the Complaint and, therefore, denies them.

9. T-Mobile is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 9 of the Complaint and, therefore, denies them.

10. T-Mobile is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 10 of the Complaint and, therefore, denies them.

11. T-Mobile admits that different types of telecommunication technologies are in use simultaneously in the same air interface and that customers of wireless telephone services generally want to enjoy the convenience of hearing and talking to each other regardless of the physical distances from each other and regardless of the physical location where each speaker is located. T-Mobile is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 11 of the Complaint and, therefore, denies them.

12. T-Mobile is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 12 of the Complaint and, therefore, denies them.

13. T-Mobile denies the allegations in paragraph 13 of the Complaint.

14. T-Mobile admits that it operates wireless networks across the United States and that it provides wireless communication services to customers under the brands T-Mobile and MetroPCS. T-Mobile further admits that its Form 10-K for the year ended December 31, 2014 states that "T-Mobile US, Inc. was formed in 2013 through the business combination between T-Mobile USA and MetroPCS Communications, Inc."

15. T-Mobile admits that its Form 10-K for the year ended December 31, 2014 includes the statements quoted in paragraph 15 of the Complaint. T-Mobile denies the remaining allegations in paragraph 15 of the Complaint.

16. T-Mobile admits that it and certain of its related companies are members of one or more Standard Setting Organizations (SSOs). T-Mobile admits that T-Mobile USA, Inc. is a member of the Alliance for Telecommunications Industry Solutions (ATIS), which is an organizational partner of 3GPP. T-Mobile further admits that T-Mobile USA, Inc. is an individual member of 3GPP via its membership in ATIS. T-Mobile admits that it has knowledge of certain ETSI specifications promulgated by 3GPP. T-Mobile denies any remaining allegations in paragraph 16 of the Complaint.

17. T-Mobile denies that its wireless networks are "Infringing Wireless Networks." T-Mobile admits that its customers use its networks to place cellular phone calls and send and receive data. T-Mobile admits that it promotes and advertises the use of its wireless networks. T-Mobile admits that its Form 10-K for the year ended December 31, 2014 includes the statements quoted in paragraph 17 of the Complaint. T-Mobile denies the remaining allegations in paragraph 17 of the Complaint.

18. T-Mobile admits that it provides customers access to its wireless networks in accordance with various "rate plans," which are offered through, for example, T-Mobile stores and

websites. T-Mobile admits that its Form 10-K for the year ended December 31, 2014 includes the statements quoted in paragraph 18 of the Complaint. T-Mobile denies the remaining allegations in paragraph 18 of the Complaint.

19. T-Mobile admits that its Form 10-K for the year ended December 31, 2014 includes the statements quoted in paragraph 19 of the Complaint. T-Mobile denies the remaining allegations in paragraph 19 of the Complaint.

20. T-Mobile admits that it sells and offers for sale, and/or offers access for others to use, its wireless networks, mobile devices, service plans, and/or SIM cards configured to access its wireless networks to place and receive voice calls and to send and receive data. T-Mobile denies the remaining allegations in paragraph 20 of the Complaint.

21. T-Mobile denies the allegations in paragraph 21 of the Complaint.

22. T-Mobile denies the allegations in paragraph 22 of the Complaint.

23. T-Mobile denies the allegations in paragraph 23 of the Complaint.

24. T-Mobile denies the allegations in paragraph 24 of the Complaint.

25. T-Mobile denies the allegations in paragraph 25 of the Complaint.

26. T-Mobile admits that it and/or its authorized retailers operate T-Mobile stores throughout the United States, including operating T-Mobile stores in this District, such as in Longview, Texas. T-Mobile denies the remaining allegations in paragraph 26 of the Complaint.

27. T-Mobile admits that Huawei sent a letter to T-Mobile dated June 6, 2014; with respect to the contents of the letter, the document speaks for itself. T-Mobile denies the remaining allegations in paragraph 27 of the Complaint.

28. T-Mobile admits that it sent a letter to Huawei dated June 23, 2014; with respect to the contents of the letter, the document speaks for itself. T-Mobile denies the remaining allegations in paragraph 28 of the Complaint.

29. T-Mobile admits that Huawei sent an e-mail to T-Mobile that was received on June 29, 2014; with respect to the contents of the e-mail, the document speaks for itself. T-Mobile denies the remaining allegations in paragraph 29 of the Complaint.

30. T-Mobile admits that it sent a letter to Huawei dated September 3, 2014; with respect to the contents of the letter, the document speaks for itself. T-Mobile denies the remaining allegations in paragraph 30 of the Complaint.

31. T-Mobile admits that as of the date of the Complaint, January 15, 2016, T-Mobile and Huawei had not entered a non-disclosure agreement. T-Mobile denies the remaining allegations of paragraph 31 of the Complaint. Further, on June 3, 2016, T-Mobile and Huawei entered a non-disclosure agreement, following Huawei's April 1, 2016 letter to T-Mobile.

32. T-Mobile denies the allegations of paragraph 32 of the Complaint.

## PARTIES

33. T-Mobile is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 33 of the Complaint and, therefore, denies them.

34. T-Mobile admits the allegations of paragraph 34 of the Complaint.

35. T-Mobile admits that T-Mobile USA, Inc. is a Delaware corporation with its principal place of business at 12920 SE 38th Street, Bellevue, Washington 98006, and that it is a wholly-owned subsidiary of T-Mobile US, Inc. T-Mobile further admits that its registered agent for service of process, Corporation Service Company, has the address of 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218. T-Mobile further admits that it has facilities at 7668 Warren

Pkwy, Frisco Bridges Tech Campus, Frisco, Texas 75034. T-Mobile denies the remainder of the allegations in paragraph 35 of the Complaint.

**JURISDICTION AND VENUE**

36. T-Mobile admits that the Complaint purports to bring an action under the patent laws of the United States, 35 U.S.C. § 101 et seq., but denies that T-Mobile has committed any acts of infringement. T-Mobile admits that this Court has subject matter jurisdiction over these patent law claims.

37. T-Mobile admits that the Complaint asserts U.S. Patent Nos. 8,798,575 ("the '575 patent"), 8,531,971 ("the '971 patent"), 8,325,675 ("the '675 patent"), and 8,908,627 ("the '627 patent") (collectively, the "Asserted Patents").

38. Paragraph 38 of the Complaint states conclusions of law for which no answer is required. To the extent that paragraph 38 of the Complaint alleges that T-Mobile has engaged in any infringing activity, T-Mobile denies the allegations.

39. T-Mobile admits that it has facilities at 7668 Warren Pkwy, Frisco Bridges Tech Campus, Frisco, Texas 75034. Paragraph 39 of the Complaint otherwise states conclusions of law for which no answer is required. To the extent that paragraph 39 of the Complaint alleges that T-Mobile has engaged in any infringing activity, T-Mobile denies the allegations.

**COUNT ONE**

**(Alleged Infringement of U.S. Patent No. 8,531,971)**

40. T-Mobile repeats and realleges all the responses in paragraphs 1 through 39 above, as if set forth fully herein.

41. T-Mobile admits that the face of the '971 patent, a copy of which is attached to the Complaint as Exhibit 1, states that it is titled "Method for Controlling Charging of Packet Data

Services" and states that it issued on September 10, 2013. T-Mobile is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 41 and, therefore, denies them. T-Mobile denies the remaining allegations in paragraph 41 of the Complaint.

42. T-Mobile denies the allegations in paragraph 42 of the Complaint.

43. T-Mobile denies the allegations in paragraph 43 of the Complaint.

44. T-Mobile denies the allegations in paragraph 44 of the Complaint.

45. T-Mobile denies the allegations in paragraph 45 of the Complaint.

46. T-Mobile denies the allegations in paragraph 46 of the Complaint.

47. T-Mobile denies the allegations in paragraph 47 of the Complaint.

48. T-Mobile denies the allegations in paragraph 48 of the Complaint.

49. T-Mobile denies the allegations in paragraph 49 of the Complaint.

50. T-Mobile denies the allegations in paragraph 50 of the Complaint.

## COUNT TWO

**(Alleged Infringement of U.S. Patent No. 8,798,575)**

51. T-Mobile repeats and realleges all the responses in paragraphs 1 through 50 above, as if set forth fully herein.

52. T-Mobile admits that the face of the '575 patent, a copy of which is attached to the Complaint as Exhibit 2, states that it is titled "Method for Improving Service Data Flow Based Charging and System Thereof" and states that it issued on August 5, 2014. T-Mobile is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 52 and, therefore, denies them. T-Mobile denies the remaining allegations in paragraph 52 of the Complaint.

53. T-Mobile denies the allegations in paragraph 53 of the Complaint.

54. T-Mobile denies the allegations in paragraph 54 of the Complaint.

55. T-Mobile denies the allegations in paragraph 55 of the Complaint.

56. T-Mobile denies the allegations in paragraph 56 of the Complaint.

57. T-Mobile denies the allegations in paragraph 57 of the Complaint.

58. T-Mobile denies the allegations in paragraph 58 of the Complaint.

59. T-Mobile denies the allegations in paragraph 59 of the Complaint.

60. T-Mobile denies the allegations in paragraph 60 of the Complaint.

61. T-Mobile denies the allegations in paragraph 61 of the Complaint.

## COUNT THREE

## (Alleged Infringement of U.S. Patent No. 8,325,675)

62. T-Mobile repeats and realleges all the responses in paragraphs 1 through 61 above, as if set forth fully herein.

63. T-Mobile admits that the face of the '675 patent, a copy of which is attached to the Complaint as Exhibit 3, states that it is titled "Data Processing Method and System" and states that it issued on December 4, 2012. T-Mobile is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 63 and, therefore, denies them. T-Mobile denies the remaining allegations in paragraph 63 of the Complaint.

64. T-Mobile denies the allegations in paragraph 64 of the Complaint.

65. T-Mobile denies the allegations in paragraph 65 of the Complaint.

66. T-Mobile denies the allegations in paragraph 66 of the Complaint.

67. T-Mobile denies the allegations in paragraph 67 of the Complaint.

68. T-Mobile denies the allegations in paragraph 68 of the Complaint.

69. T-Mobile denies the allegations in paragraph 69 of the Complaint.

70. T-Mobile denies the allegations in paragraph 70 of the Complaint.

71. T-Mobile denies the allegations in paragraph 71 of the Complaint.

72. T-Mobile denies the allegations in paragraph 72 of the Complaint.

**COUNT FOUR**

**(Alleged Infringement of U.S. Patent No. 8,908,627)**

73. T-Mobile repeats and realleges all the responses in paragraphs 1 through 72 above, as if set forth fully herein.

74. T-Mobile admits that the face of the ’627 patent, a copy of which is attached to the Complaint as Exhibit 4, states that it is titled “Data Processing Method and System” and states that it issued on December 9, 2014. T-Mobile is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 74 and, therefore, denies them. T-Mobile denies the remaining allegations in paragraph 74 of the Complaint.

75. T-Mobile denies the allegations in paragraph 75 of the Complaint.

76. T-Mobile denies the allegations in paragraph 76 of the Complaint.

77. T-Mobile denies the allegations in paragraph 77 of the Complaint.

78. T-Mobile denies the allegations in paragraph 78 of the Complaint.

79. T-Mobile denies the allegations in paragraph 79 of the Complaint.

80. T-Mobile denies the allegations in paragraph 80 of the Complaint.

81. T-Mobile denies the allegations in paragraph 81 of the Complaint.

82. T-Mobile denies the allegations in paragraph 82 of the Complaint.

83. T-Mobile denies the allegations in paragraph 83 of the Complaint.

## ANSWER TO DEMAND FOR JURY TRIAL

84. Paragraph 84 of the Complaint sets forth Huawei's demand for a trial by jury on all claims and issues so triable, and no response to that demand is required.

## ANSWER TO PRAYER FOR RELIEF

85. To the extent any response is required to any paragraph of Huawei's Prayer for Relief, T-Mobile denies that Huawei is entitled to any of the requested relief and denies any allegations of its Prayer for Relief as to T-Mobile.

## AFFIRMATIVE DEFENSES TO HUAWEI'S COMPLAINT

T-Mobile asserts the following defenses to Huawei's Complaint, without admitting or acknowledging that T-Mobile bears the burden of proof as to any of them or that any must be pleaded as defenses. T-Mobile specifically reserves all rights to allege additional defenses that become known through the course of discovery.

### FIRST AFFIRMATIVE DEFENSE
**(Failure to State a Claim)**

Huawei's Complaint fails to state facts sufficient to constitute a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE
**(Invalidity)**

One or more claims of the Huawei Asserted Patents are invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more provisions of 35 U.S.C. §§ 101 *et seq.*, including 35 U.S.C. §§ 101, 102, 103, 112, and/or 116.

### THIRD AFFIRMATIVE DEFENSE
**(Non-infringement)**

T-Mobile has not directly infringed (whether literally or under the doctrine of equivalents) and has not induced or contributed to infringement of any valid claim of the Huawei Asserted Patents.

### FOURTH AFFIRMATIVE DEFENSE
**(Prosecution History Estoppel)**

Huawei's claims are barred in whole or in part by prosecution history estoppel.

### FIFTH AFFIRMATIVE DEFENSE
**(Statutory Limitations on Damages)**

Huawei's claims for alleged damages or costs are statutorily limited by 35 U.S.C. §§ 286, 287, and/or 288 and by 28 U.S.C. § 1498.

**SIXTH AFFIRMATIVE DEFENSE**
**(No Equitable Entitlement to Injunctive Relief)**

Huawei is not entitled to injunctive relief at least because any alleged injury to Huawei is not immediate or irreparable, and Huawei has an adequate remedy at law for its claims.

Huawei has made binding FRAND commitments for each of the Asserted Patents in which it agreed to accept FRAND royalties as the sole compensation for any use of the patents. By making FRAND commitments, patent holders waive injunctive remedies, except in exceptional circumstances where FRAND royalties are not available. Granting an injunction for a FRAND-committed patent where FRAND royalties are available threatens to undermine the pro-competitive benefits of collective standard setting and would harm competition and consumers.

Accordingly, Huawei will not be able to demonstrate (1) irreparable injury through an award of FRAND damages if infringement of a valid patent is proven, (2) that FRAND damages are inadequate remedies, (3) that an equitable remedy is appropriate on balance, and (4) that the public interest would not be disserved by the issuance of an injunction.

**SEVENTH AFFIRMATIVE DEFENSE**
**(Waiver, Estoppel, and/or Unclean Hands)**

Huawei's claims for relief are barred, in whole or in part, under principles of equity including, but not limited to, laches, waiver, estoppel, and/or unclean hands.

Huawei violated its obligation as a member of ETSI to timely disclose the Asserted Patents (or patents or patent applications within the same families) in accordance with the requirements of the ETSI IPR Policy. As early as 1994, Clause 4.1 of the Policy required that "[e]ach MEMBER shall use its reasonable endeavours to timely inform ETSI of ESSENTIAL IPRs it becomes aware of. In particular, a MEMBER submitting a technical proposal for a STANDARD shall, on a bona

fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted." Huawei was bound by the ETSI IPR Policy during its participation at ETSI and also at the 3rd Generation Partnership Project (3GPP), of which ETSI is an organizational member.

ETSI and its members rely on the disclosure requirements to safeguard the standard-setting process and ensure that decisions regarding what technology to standardize are made with an understanding of the potential implications for those decisions on licensing patents that may be claimed essential to those technologies.

Huawei failed to disclose the existence of its Asserted Patents or family members of its Asserted Patents during the standardization of cellular standards at ETSI and 3GPP, while participating in the development of technologies that it apparently believed were covered by patents now asserted against T-Mobile. Huawei's failure to timely disclose IPRs constitutes at least a waiver of its rights to enforce any claimed-essential patents against any entity practicing the standard and renders the patents unenforceable. Alternatively, this conduct estops Huawei from asserting the patents and/or bars this suit through the doctrine of unclean hands.

The timeline for the late disclosure of each of the Asserted Patents is summarized in paragraphs 33 to 46 of T-Mobile's Counterclaims, set forth below.

## EIGHTH AFFIRMATIVE DEFENSE
**(Contractual Limitation on Damages)**

As set forth in T-Mobile's Counterclaims below, Huawei committed to ETSI to license the Asserted Patents on FRAND terms. Huawei's claims for monetary relief are, therefore, limited to FRAND royalties.

**<u>NINTH AFFIRMATIVE DEFENSE</u>**
**(Non-Compliance with Licensing Obligation)**

Huawei's claims for relief are barred, in whole or in part, by its failure to comply with its obligation to offer to license the Huawei Asserted Patents on FRAND terms, including its refusal to offer licensing terms for each of the Asserted Patents.

**<u>TENTH AFFIRMATIVE DEFENSE</u>**
**(Patent Exhaustion and License)**

Upon information and belief, Huawei's claims for relief are barred, in whole or in part, as a result of patent exhaustion and/or a license to the Huawei Asserted Patents. As set forth more fully below, to the extent T-Mobile's vendors, including at least Ericsson and Nokia, have entered into patent license agreements with Huawei, T-Mobile's use of network equipment from those vendors during the terms of those agreements is authorized under those agreements.

**<u>ELEVENTH AFFIRMATIVE DEFENSE</u>**
**(Contractual Bar to Injunctive Relief)**

Huawei's claims for injunctive relief are barred because T-Mobile is willing to license on FRAND terms any of the Huawei Asserted Patents that is found infringed, valid, and enforceable.

**<u>TWELFTH AFFIRMATIVE DEFENSE</u>**
**(Patent Misuse)**

Huawei seeks to overextend its rights in the Asserted Patents with anticompetitive effect, thereby rendering the Asserted Patents unenforceable. As described more fully below in paragraphs 71 to 74 of T-Mobile's Counterclaims, Huawei has demanded that T-Mobile license the Asserted Patents on an "all or nothing" basis as part of Huawei's entire portfolio of fourth generation ("4G") cellular patents. Huawei insists on a portfolio-wide license notwithstanding its binding FRAND commitments to license each of the Asserted Patents individually and on a FRAND basis and that T-Mobile has or has had rights to Huawei patents by virtue of its vendors

and their licenses with Huawei. Through seeking from T-Mobile royalties on misused patents and leveraging the threat of injunctions, Huawei is attempting to extend the scope of its patent rights, be compensated twice for its patents, and/or condition the granting of a license to any of the asserted patents on T-Mobile taking a license to other Huawei patents.

As described in more detail below, Huawei's misuse has harmed and threatens to harm competition, including the inevitable passing on to consumers of improper royalties demanded by Huawei and decreases in innovation, quality, and consumer choice for products and services that support the 4G standard, as well as decreased incentives to participate in standard setting generally and to support products that rely on standards. In addition, T-Mobile has been harmed through being forced to incur expenses and expend time and effort in defending against this litigation.

## COUNTERCLAIMS

Counterclaimant T-Mobile, on personal knowledge as to its own acts, and on information and belief as to all others based on its own and its attorneys' investigation, alleges its Counterclaims against Huawei as follows:

## NATURE OF THE ACTION

1. These Counterclaims arise from Huawei's baseless allegation of infringement of the Huawei Asserted Patents and its assertion of those patents—including by improperly seeking an injunction against T-Mobile—in violation of its binding contractual obligations to the European Telecommunications Standards Institute ("ETSI") to license them on fair, reasonable, and non-discriminatory ("FRAND") terms.

2. Rather than abiding by its FRAND commitments, negotiating in good faith with T-Mobile, and providing licensing terms for the Asserted Patents, Huawei has singled out T-Mobile in a campaign of unlawful licensing and litigation conduct. Huawei's campaign against T-Mobile is a direct response to T-Mobile taking action against Huawei for its theft of T-Mobile's confidential information relating to a robot that T-Mobile developed to test cellular handsets and devices. Huawei gained access to this robot because it supplied handsets to T-Mobile and exploited that access to steal from T-Mobile. When caught, Huawei's response was to retaliate through its assertion of the Asserted Patents and others asserted in separate actions.

3. Huawei brought this action before even making any offer to T-Mobile to license the Asserted Patents, and since initiating this suit Huawei has refused to provide FRAND terms to T-Mobile for the Huawei Asserted Patents. Huawei has attempted to increase its leverage against T-Mobile by improperly seeking to enjoin T-Mobile, despite the fact that Huawei has acknowledged that the FRAND commitment forecloses seeking such relief.

4. An actual case or controversy exists between the parties concerning the infringement, validity, and enforceability of one or more of the claims of the Huawei Asserted Patents.

**PARTIES**

5. T-Mobile is a corporation organized under the laws of Delaware, having its principal place of business in Bellevue, Washington.

6. According to Huawei's Complaint, Huawei is a Chinese corporation with its principal place of business at Bantian, Longgang District, Shenzhen, People's Republic of China.

**JURISDICTION**

7. This Court has jurisdiction over the subject matter of these Counterclaims under, without limitation, 28 U.S.C. §§ 1331, 1367, 1338(a), 2201, and 2202.

8. Huawei has subjected itself to personal jurisdiction by suing T-Mobile in this Court.

**VENUE**

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391.

10. Huawei has consented to venue in this Court by filing its claims for patent infringement in this Court, in response to which these counterclaims are asserted.

**BACKGROUND**

11. T-Mobile is one of the largest wireless network operators in the United States with a network that reaches ninety-six percent of Americans, and a customer base of approximately 67 million as of July 2016.

12. T-Mobile's cellular networks support certain cellular communication protocols that are incorporated into industry standards. These standards are created and publicly distributed by standard setting organizations ("SSOs").

13. Industry standards provide potential benefits by allowing devices made by different companies to communicate with each other because these devices are operating using the same standard. But standards also present risks of harm to competition and consumers when patent holders claim to have patents essential to the standards ("SEPs")—i.e., the standard cannot be practiced without using the patent—and use those patents as leverage to demand excessive royalties or hold-up companies that use the standard. Before a standard is set, the SSO has the ability to choose different ways of implementing particular functionality within the standard. But once the standard is set and a particular functionality is incorporated, users of the standard become "locked in" to the use of that functionality through their investment in products and services that support the standard. This "lock-in" effect creates a risk that patent holders claiming to have essential patents will attempt to exploit their patents by demanding excessive royalties or seeking to enjoin the use of their patents. In particular, patent holders of claimed-essential patents may seek royalties that do not reflect the actual value of their patents (which may cover only a fraction of the matter addressed in a given standard) but instead are based on the value of the overall standard itself and the user's investments in supporting the standard.

14. The risk of exploitative licensing conduct for SEPs is exacerbated by the fact that SSOs typically do not make any evaluation of whether or not a claimed-essential patent is actually essential.

15. In response to this risk of exploitative behavior, SSOs have adopted licensing commitments that govern patents claimed to be essential to a standard. Many SSOs impose a requirement that patent holders claiming to have essential patents must timely disclose those patents to the SSO and commit to license them on FRAND terms and conditions.

**ETSI and its Intellectual Property Rights Policy**

16. The ETSI is an independent, non-profit SSO that produces globally accepted standards for the telecommunications industry. ETSI has more than 750 members from 63 countries across five continents. ETSI created or helped to create many telecommunication standards, including the 2G (e.g., GSM), 3G (e.g., WCDMA/UMTS), and 4G (e.g., LTE) cellular communication standards.

17. Along with six other regional SSOs, ETSI is an Organizational Partner in the Third Generation Partnership Project ("3GPP"). 3GPP produces technical specifications that are adopted as standards by Organizational Partners, such as ETSI. 3GPP was created to oversee work on global 3G cellular specifications and has subsequently worked on creating 4G specifications. The 3GPP Organizational Partners agreed that members of a particular Organizational Partner would be bound by the IPR policy of that Organizational Partner when participating at 3GPP.

18. ETSI has adopted an Intellectual Property Rights ("IPR") Policy, incorporated as Annex 6 of the ETSI Rules of Procedure. The ETSI IPR Policy is governed by the laws of France, and provides that "[a]ny right granted to, and any obligation imposed on, a MEMBER which derives from French law and which are not already contained in the national or supranational law applicable to that MEMBER is to be understood as being of solely a contractual nature."

19. Among other requirements, the ETSI IPR Policy imposes on members an obligation to disclose patents and patent applications to ETSI and its members that a member believes are or may become essential to an ETSI standard. Once such a disclosure is made, the member is requested to submit an irrevocable undertaking confirming its willingness to license the IPRs it has disclosed on FRAND terms and conditions.

20. Specifically, Clause 4.1 of the ETSI IPR Policy provides as follows regarding the disclosure obligation at ETSI:

> Subject to Clause 4.2 below, each MEMBER shall use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

In its second sentence, Clause 4.1 imposes a "particular" requirement on members submitting a technical proposal to disclose the existence of any potentially essential IPR before the proposal is adopted.

21. The disclosure requirement under Clause 4.1 of the ETSI IPR Policy is intended to ensure that when ETSI members (or participants at 3GPP) are deciding upon the functionality to include in a standard specification, they have an understanding of the existence of IPR that may potentially be implicated by the standard. This knowledge allows members to make choices about the standard with a better understanding of the consequences of their choices for implementation of the standard. ETSI and its members rely on the safeguards of the disclosure and FRAND licensing obligation to ensure the viability and commercial potential of the standards adopted by ETSI.

22. The ETSI IPR Policy further requests that SEP owners submit an irrevocable written undertaking that they are prepared to grant irrevocable licenses on "fair, reasonable, and non-discriminatory" or FRAND terms and conditions. Clause 6.1 states:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licences on fair, reasonable and non-discriminatory

> ("FRAND") terms and conditions under such IPR to at least the following extent:
>
> ● MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;
>
> ● sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;
>
> ● repair, use, or operate EQUIPMENT; and
>
> ● use METHODS.
>
> The above undertaking may be made subject to the condition that those who seek licences agree to reciprocate.

23. ETSI's IPR Policy was designed to benefit all ETSI members, as well as all other parties that implement an ETSI standard. In particular, the Policy describes in Clause 3.1 that it has the objective to "reduce the risk" to those implementing the standards or other technical specifications "that investment in the preparation, adoption and application of the STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable."

24. Through disclosure of potentially essential IPRs and obtaining FRAND commitments for them, ETSI is able to include technology in its standards that may be covered by IPRs with confidence that hold-up tactics by owners of declared SEPs will not undermine the subsequent widespread adoption of the standards. If a FRAND undertaking is not made, the IPR Policy provides ETSI an opportunity, during the development of the standard, to ensure that the standard avoids the patent or patent application in question.

25. T-Mobile's corporate parent, Deutsche Telekom AG, is an ETSI member. The ETSI IPR Policy defines a "MEMBER" as including the member's "affiliates," which includes those entities owned or controlled by a member.

26. Huawei and its affiliates are members of ETSI.

**Huawei's FRAND Commitments And The Consequences Of Those Commitments**

27. Huawei has made binding FRAND commitments to ETSI for each of the Huawei Asserted Patents. For example, in a declaration dated February 25, 2011, Huawei disclosed to ETSI the Chinese priority application to U.S. Patent No. 8,908,627. The declaration indicates that "[i]n accordance with Clause 4.1 of the ETSI IPR Policy the Declarant and/or its AFFILIATES hereby informs ETSI that it is the Declarant's and/or its AFFILIATES' present belief that the IPR(s) disclosed in the attached IPR Information Statement Annex may be or may become ESSENTIAL in relation to at least the ETSI Work Item(s), STANDARD(S) and/or TECHNICAL SPECIFICATION(S) identified in the attached IPR Statement Annex." Further, the declaration provides that "the Declarant and/or its AFFILIATES are prepared to grant irrevocable licences under this/these IPR(s) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy." Consistent with the terms of the ETSI IPR Policy, the declaration also provides that "[t]he construction, validity and performance of this IPR information statement and licensing declaration shall be governed by the law of France." The declaration was signed by Wang Xin, listed as a Patent Manager at Huawei, and indicated that the signatory has "the authority to bind the Declarant and/or its AFFILIATES to the representations and commitments provided in this form."

28. Huawei submitted similar forms for each of the Huawei Asserted Patents:

| Declared IPR | Date of Declaration | Signatory |
|---|---|---|
| Chinese Patent Application for U.S. Patent No. 8,531,971 | August 29, 2005 | Mengbin Wen |
| Chinese Patent Application for U.S. Patent No. 8,798,575 | August 29, 2005 | Mengbin Wen |
| Chinese Patent Application for U.S. Patent No. 8,325,675 | February 25, 2011 | Wang Xin |

29. Through its submission of declarations to ETSI for each of the Asserted Patents, Huawei committed to license each of the Asserted Patents on FRAND terms and conditions. A FRAND commitment carries with it certain consequences, each of which Huawei has previously acknowledged.

30. First, a party that has made a FRAND commitment has committed that it will be prepared to license its patents. That requires being prepared to propose licensing terms to a potential licensee. In litigation with InterDigital in 2012, Huawei recognized that FRAND-committed patents could be declared "void and unenforceable" where the patent holder initiated litigation against a party without proposing FRAND terms: "The Asserted Patents are void and unenforceable by reason of the equitable doctrine of unclean hands based (among other things) on . . . their failure to comply with the rules and obligations of ETSI, 3GPP, and other SSOs including TIA by undertaking to grant but failing to propose RAND or FRAND terms for licensing the Asserted Patents they claim are essential." Likewise, in the same litigation, Huawei recognized that "a FRAND obligation requires more than good faith efforts, and actually requires an SEP holder to grant FRAND licenses."

31. Second, by making a FRAND commitment, the patent holder relinquishes the right to seek an injunction or other exclusionary remedies except in exceptional circumstances, such as where it would not have the ability to obtain FRAND royalties through damages. Huawei has recognized this limitation is a consequence of making a FRAND commitment. For example, in January 2016 in litigation in the United Kingdom against Unwired Planet, Huawei described the limitations on an SEP holder as follows: "an SEP holder should not seek an injunction against a willing licensee, nor should the threat of an injunction be used as a means to extract higher royalties and/or other concessions from a locked-in implementer of a standard." Similarly,

Huawei recognized in a 2013 letter to the United States District Court for the District of Delaware that injunctive relief for FRAND-committed patents could only be appropriate where a FRAND rate has been adjudicated or arbitrated and the potential licensee nonetheless refuses to pay that rate: "exclusionary or injunctive relief . . . should follow only after adjudicated or arbitrated FRAND terms are set, and refused."

32. Third, under Clause 6.1 of the ETSI IPR Policy as well as the wording of the ETSI declarations Huawei submitted, the FRAND commitment is made on an IPR-by-IPR basis and, therefore, creates an obligation to license individual patents on FRAND terms and conditions. Huawei described the effect of making a FRAND commitment to ETSI as attaching to a "particular SEP" or standard essential patent as follows in January 2016 in its litigation with Unwired Planet:

> The ETSI FRAND undertaking attaches to a particular SEP: see Article 6.1 of and the definition of "IPR" contained in the ETSI IPR Policy. By making a FRAND undertaking, an SEP owner accordingly declares its willingness to grant licences under that SEP, if so requested. The fact that a person or company may own more than one SEP does not alter the true legal position.

Further, Huawei recognized that simply because a patent holder has a portfolio of claimed-essential patents subject to FRAND commitments does not mean that it may compel a party to license its patents "on a global 'all or nothing' basis":

> [I]t is wholly inconsistent both with the express terms of the FRAND undertaking and with its underlying purpose for an SEP owner to refuse to license an SEP unless the licensee also takes a licence under all of the SEP owner's other telecommunications patents (whether SEPs and non-SEPs or just SEPs) on a global "all or nothing" basis.

**Huawei's Untimely Disclosure To ETSI Of The Asserted Patents**

33. As described above, under Clause 4.1 of the ETSI IPR Policy, ETSI members are required to disclose to ETSI any patents or patent applications that may become essential if a proposal made by the member is adopted.

34. For each of the Asserted Patents, Huawei made technical proposals to ETSI and 3GPP that relate to technology to which Huawei ultimately declared the patent essential. But each of Huawei's declarations to ETSI was made long after the technical proposal was made and thus violated the disclosure requirement under Clause 4.1 of the ETSI IPR Policy:

**’971 Patent**

35. On October 20, 2011, Huawei filed U.S. patent application 13/277,506, which issued on September 10, 2013 as U.S. Patent No. 8,531,971. The ’971 patent claims priority to Chinese Patent Application No. 200410030955 filed on April 1, 2004, Chinese Patent Application No. 200410033721 filed on April 9, 2004, and Patent Cooperation Treaty ("PCT") Application No. PCT/CN2005/000388 filed on March 28, 2005. The ’971 patent lists Xiaoqin Duan as the sole inventor.

36. Huawei has alleged that the ’971 patent is essential to practicing 3GPP technical specifications 3GPP TS 23.125, which was developed by 3GPP working group SA2. Huawei and the named inventor of the ’971 patent participated in working group SA2 and the development of 3GPP TS 23.125. *See, e.g.*, Minutes of the SA2 #39 meeting, Draft 01, 3GPP TSG-SA2 #39, April 19-23, 2004 (Apr. 28, 2004); Minutes of the SA2 #39 meeting, Draft 03, 3GPP TSG-SA2 #39, April 19-23, 2004 (May 24, 2004); Minutes of the SA2 #41 meeting, Draft 01, 3GPP TSG-SA2 #41, August 16-20, 2004 (Aug. 26, 2004); Minutes of the SA2 #41 meeting, 3GPP TSG-SA2 #41, August 16-20, 2004 (Oct. 25, 2004); Meeting Report for 3GPP TSG SA WG2 Meeting #42, 3GPP

TSG-SA2 #42, October 11-15, 2004 (November 30, 2004); List of Registered Attendees at 3GPP TSG-SA2 #39; List of Registered Attendees at 3GPP TSG-SA2 #41; List of Registered Attendees at 3GPP TSG-SA2 #42; List of tdocs from 3GPP TSG-SA2 #39; List of tdocs from 3GPP TSG-SA2 #41; List of tdocs from 3GPP TSG-SA2 #42; Tdoc S2-041284, 3GPP TSG-SA2 #39, April 19-23, 2004; Tdoc S2-041458, 3GPP TSG-SA2 #39, April 19-23, 2004; Tdoc S2-041662, 3GPP TSGSA2 #39, April 19-23, 2004; Tdoc S2-042563, 3GPP TSG-SA2 #41, August 16-20, 2004; Tdoc S2-042786, 3GPP TSG-SA2 #41, August 16-20, 2004; Tdoc S2-043096, 3GPP TSG-SA2 #42, October 11-15, 200; Tdoc S2-043282, 3GPP TSG-SA2 #42, October 11-15, 2004; Tdoc S2-043378, 3GPP TSG-SA2 #42, October 11-15, 2004. 3GPP froze TS 23.125 on December 16, 2004.

37. Huawei did not disclose the ’971 patent or any member of the ’971 patent’s family to ETSI or 3GPP prior to the freeze date for TS 23.125. In fact, Huawei failed to disclose that any member of the ’971 patent family was believed to be essential to TS 23.125 until April 29, 2005, over four months after the freeze date of TS 23.125 and over twelve months after Huawei filed its Chinese priority applications.

**<u>’575 Patent</u>**

38. On November 10, 2006, Huawei filed U.S. patent application 11/558,774, which issued on August 5, 2014 as U.S. Patent No. 8,798,575. The ’575 patent claims priority to Chinese Patent Application No. 200410044433 filed on May 12, 2004 and PCT Application No. PCT/CN2005/000665 filed on May 12, 2005. The ’575 patent lists Xiaoqin Duan and Yajuan Wu as the named inventors.

39. Huawei has alleged that the ’575 patent is essential to practicing 3GPP technical specification 3GPP TS 23.125, which was developed by 3GPP working group SA2. Huawei and

the named inventors of the ’575 patent participated in working group SA2 and the development of 3GPP TS 23.125. Minutes of the SA2 #40 meeting, Draft 01, 3GPP TSG-SA2 #40, May 17-21, 2004 (June 4, 2004); Minutes of the SA2 #40 meeting, Draft 04, 3GPP TSG-SA2 #40, May 17-21, 2004 (Aug. 25, 2004); Minutes of the SA2 #41 meeting, Draft 01, 3GPP TSG-SA2 #41, August 16-20, 2004 (Aug. 26, 2004); Minutes of the SA2 #41 meeting, 3GPP TSG-SA2 #41, August 16-20, 2004 (Oct. 25, 2004); List of Registered Attendees at 3GPP TSG-SA2 #40; List of Registered Attendees at 3GPP TSG-SA2 #41; List of tdocs from 3GPP TSG-SA2 #40; List of tdocs from 3GPP TSG-SA2 #41; Tdoc S2-041930, 3GPP TSG-SA2 #40, May 17-21, 2004; Tdoc S2-042781, 3GPP TSG-SA2 #41, August 16-20, 2004. 3GPP froze TS 23.125 on December 16, 2004.

40. Huawei did not disclose the ’575 patent or any member of the ’575 patent’s family to ETSI or 3GPP prior to the freeze date for TS 23.125. In fact, Huawei failed to disclose that any member of the ’575 patent family was believed to be essential to TS 23.125 until August 29, 2005, over eight months after the freeze date of TS 23.125 and over 15 months after Huawei filed its Chinese priority application.

**’675 Patent**

41. On February 13, 2009, Huawei filed U.S. patent application 12/371,078, which issued on December 4, 2012 as U.S. Patent No. 8,325,675. The ’675 patent claims priority to Chinese Patent Application No. 200610115381 filed on August 15, 2006, and is a continuation of PCT Application No. PCT/CN2007/070384 filed on July 30, 2007. The ’675 patent lists Wenfu Wu and Weihua Hu as the named inventors.

42. Huawei has alleged that the ’675 patent is essential to practicing 3GPP technical specification 3GPP TS 23.401, which was developed by 3GPP working group SA2. Huawei and

at least one named inventor of the '675 patent participated in working group SA2 and the development of 3GPP TS 23.401. *See, e.g.*, 3GPP TSG SA WG2 #53 Meeting Report (June 26 – June 30, 2006); S2-062539 (June 26 – June 30, 2006); 3GPP TSG SA WG2 #54 Meeting Report (Aug. 28 – Sept. 1, 2006); S2-062755 (Aug. 28 – Sept. 1, 2006); S2-063362 (Aug. 28 – Sept. 1, 2006); 3GPP TSG SA WG2 #56 Meeting Report (Jan. 15 – Jan. 19, 2007); S2-070078 (Jan. 15 – Jan. 19, 2007); S2-070686 (Feb. 12 – Feb. 15, 2007); 3GPP TSG SA WG2 #56c Meeting Report (Mar. 26 – Mar. 30, 2007); S2-071129 (Mar. 26 – Mar. 30, 2007); S2-071130 (Mar. 26 – Mar. 30, 2007); S2-071520 (Mar. 26 – Mar. 30, 2007); S2-071604 (Mar. 26 – Mar. 30, 2007); 3GPP TSG SA WG2 #57 Meeting Report (Apr. 23 – Apr. 27, 2007); S2-072158 (Apr. 23 – Apr. 27, 2007); 3GPP TSG SA WG2 #59 Meeting Report (Aug. 27 – Aug. 31, 2007); S2-073262 (Aug. 27 – Aug. 31, 2007); 3GPP TSG SA WG2 #60 Meeting Report (Oct. 8 – Oct. 12, 2007); S2-073988 (Oct. 8 – Oct. 12, 2007). 3GPP froze TS 23.401 on December 11, 2008.

43. Huawei did not disclose the '675 patent or any member of the '675 patent's family to ETSI or 3GPP prior to the freeze date for TS 23.401. In fact, Huawei failed to disclose that any member of the '675 patent family was believed to be essential to TS 23.401 until February 25, 2011, over 26 months after the freeze date of TS 23.401 and over four and a half years after Huawei filed its Chinese priority application.

**<u>'627 Patent</u>**

44. On November 8, 2012, Huawei filed U.S. patent application 13/672,307, which issued on December 9, 2014 as U.S. Patent No. 8,908,627. The '627 patent claims priority to Chinese Patent Application No. 200610115381 filed on August 15, 2006. The '627 patent is a continuation of PCT Application No. PCT/CN2007/070384 filed on July 30, 2007 and the '675

patent, and therefore covers the same subject matter as the ’675 patent. The ’627 patent lists Wenfu Wu and Weihua Hu as the named inventors.

45. Huawei has alleged that the ’627 patent is essential to practicing 3GPP technical specification 3GPP TS 23.401, which was developed by 3GPP working group SA2. As discussed above, Huawei and at least one named inventor of the ’627 patent participated in working group SA2 and the development of 3GPP TS 23.401. 3GPP froze TS 23.401 on December 11, 2008.

46. Huawei did not disclose the ’627 patent or any member of the ’627 patent’s family to ETSI or 3GPP prior to the freeze date for TS 23.401. In fact, Huawei failed to disclose that any member of the ’627 patent family was believed to be essential to TS 23.401 until February 25, 2011, over 26 months after the freeze date of TS 23.401 and over four and a half years after Huawei filed its Chinese priority application.

**Patents That Are Actually Essential To Standards Provide Monopoly Power In Input Technology Markets For Standardized Functionalities**

47. Each cellular standard developed by ETSI or 3GPP consists of many different technologies that perform a variety of functions. The technologies that perform each of these functions are essential inputs into the manufacture and supply of products and services that support the standards.

48. In the process of developing cellular specifications and standards, ETSI and 3GPP participants choose particular technology to provide each individual function within the standards. ETSI and 3GPP participants evaluate whether to standardize particular proposed functionalities and, if so, which viable, alternative competing technologies to select to perform those functionalities.

49. Once a standard, like LTE, is adopted, the viability of using alternative technologies for the functionalities of the standard beyond those included in the standard is

eliminated. That is, standardization eliminates as substitutes all the technologies that would have been capable of performing the functionality in the standard but that were not chosen to include in the standard. Parties supplying products that support the standard, such as T-Mobile, thus become "locked-in" to the standardized technology.

50. If a technology selected for inclusion in the standard is protected by patents, the patent owner controls the supply of that particular input technology for the standard. This is true for each function comprising the standard for which patented technology was selected.

51. The functionality for cellular standards for each input technology comprises its own relevant market for antitrust purposes (individually, an "Input Technology Market," and collectively, the relevant "Input Technology Markets"). To the extent that Huawei's declared SEPs are actually essential—as Huawei claims—Huawei holds monopoly power in the various Input Technology Markets for the various functions claimed to be covered by Huawei's declared SEPs. That is because, post-standardization, formerly viable alternative technologies are no longer viable because of the lock-in effect discussed above.

52. Cellular standards are employed throughout the world and alternative technologies competing to be incorporated into the cellular standards were offered by suppliers from around the world. Accordingly, the geographic scope of each of the relevant Input Technologies Markets described above is worldwide.

53. To the extent that Huawei is correct in its claims that it has patents covering technologies that have been incorporated into the relevant standards, Huawei has the power to raise prices and exclude competition with respect to each of the technologies covered by its patents and incorporated in the relevant standard. An Input Technology Market has high barriers to entry

because the standardization process eliminates the viability of alternative technologies as substitutes to perform the standardized functionality in the Input Technology Market.

54. In the alternative, Huawei holds monopoly positions in each of the Input Technology Markets for which it claims to have essential patents until those patents are ultimately determined not to be essential (or found unenforceable or invalid). Simply by asserting that it has an essential patent, Huawei is able to obtain royalties or other licensing terms for the patent above what it could have obtained before ETSI or 3GPP standardized the technology Huawei claims is covered by the patent. Huawei has such hold-up power because without a license, a party using the relevant cellular standards risks the threat of an improper injunction claim that could put its entire business at risk.

55. Further, this hold-up power is exacerbated by Huawei's amassing a large portfolio of patents. Huawei has claimed in negotiations with T-Mobile that it holds "hundreds of standard essential patents and implementation patents in the United States and Europe." In total, Huawei claims to own over 41,000 issued patents in jurisdictions around the world. Compl. ¶ 10. As described more fully below, Huawei has used the tactic of serial litigation—filing four separate infringement actions against T-Mobile asserting a total of fourteen patents and requesting injunctions—in an improper attempt to gain negotiating leverage over T-Mobile. In addition, as set forth more fully below, Huawei has refused to license individually its claimed-essential patents. Through its serial litigation tactics and taking the "all-or-nothing" approach that Huawei has previously recognized is not allowed under the FRAND commitment, Huawei heightens the hold-up threat of its SEPs. T-Mobile is faced with the prospect of acceding to Huawei's non-FRAND, portfolio-wide demands or risking serial litigation and the attendant risk of an improperly-sought injunction crippling its business.

**Huawei's Theft of T-Mobile's Proprietary Robot Technology and Huawei's Retaliatory Non-FRAND Licensing Demand**

56. On May 5, 2014, T-Mobile sent Huawei a letter regarding Huawei's theft of an arm from T-Mobile's proprietary robot for testing mobile devices, named Tappy, and confidential information related to Tappy.

57. Tappy was designed to allow T-Mobile to mimic the motions of a user touching a handset in order to allow T-Mobile to test and improve the quality of handsets T-Mobile provides its customers. Tappy was developed at significant time and expense to T-Mobile and provided it with a competitive advantage against its competitors.

58. Huawei has been a supplier of handsets to T-Mobile. As a supplier, a limited number of Huawei personnel subject to strict limitations on misappropriating T-Mobile's trade secrets were allowed to be present in T-Mobile's facility in Bellevue, Washington when Tappy was used to test Huawei handsets.

59. Beginning in 2012, when Huawei personnel first had access to Tappy, they copied software and confidential specifications relating to Tappy and even stole one of Tappy's arms. Indeed, Huawei has admitted that a Huawei employee took photographs of Tappy and sent them to other Huawei employees and that another Huawei employee took part of Tappy from T-Mobile's facility.

60. When T-Mobile raised the thefts with Huawei through its May 5, 2014 letter, Huawei's response was to send a June 6, 2014 letter in which Huawei raised for the first time with T-Mobile a licensing program relating to Huawei's claimed-essential cellular patents. In that letter, Huawei suggested that it would "present our patents and additional information to you, upon the signature of a mutual non-disclosure agreement."

61. On June 23, 2014, T-Mobile responded to Huawei's June 6 letter. T-Mobile noted that Huawei's licensing demand was apparently made in response to T-Mobile raising Huawei's thefts related to Tappy but indicated that it was nonetheless "willing to evaluate and respond to the issues you have raised to the extent we are provide with sufficient meaningful information to do so." The letter further noted that Huawei had only identified patent numbers in its June 6 letter and that it "provides little or no information regarding how Huawei's Licensing Program could be at all relevant to T-Mobile, what FRAND terms Huawei is proposing, or what precisely you would like T-Mobile to discuss or consider."

62. Huawei responded in a letter dated June 29, 2014, suggesting that it was "willing to provide more information demonstrating the value of our patents once a NDA is entered."

63. On September 2, 2014, T-Mobile filed a complaint in the District Court for the Western District of Washington seeking to hold Huawei to account for its thefts of trade secrets and technology relating to Tappy.

64. By letter dated September 3, 2014, T-Mobile responded to Huawei's June 29 letter. T-Mobile again pointed out that it did not understand the need for an NDA in order for Huawei to provide its views to T-Mobile on its patents. Further, T-Mobile requested that Huawei provide specifics regarding its claim that T-Mobile requires a license from Huawei, including requesting that Huawei "list each T-Mobile service that you believe needs a Huawei license, which of Huawei's 'exemplary' patents that Huawei believes are relevant to each service." Further, "in order for T-Mobile to evaluate whether any of its suppliers have already obtained (or are in the process of obtaining) rights that cover T-Mobile," T-Mobile requested that Huawei "provide us with a list of those actual and potential licensees and identify the FRAND terms that Huawei offered to them." T-Mobile further noted that Huawei's "refusal to provide this basic information

is preventing us from reaching any conclusions regarding what Huawei is proposing and why Huawei believes its patents are in any way relevant to T-Mobile." T-Mobile closed its letter by stating its willingness to "evaluate any FRAND licensing offer should Huawei ever make one, to the extent we are provided meaningful information to do so."

65. No FRAND offer from Huawei was forthcoming. Rather, Huawei's response came on January 16, 2016 when it sent a letter to T-Mobile in order to provide "courtesy copies of four complaints for patent infringement" filed in this Court the day before.

**Huawei's Unlawful Attempts to Enjoin T-Mobile**

66. On January 15, 2016, Huawei filed this action, along with three others, asserting a total of fourteen patents against T-Mobile that Huawei contends are essential to cellular standards. In each case Huawei sought injunctive relief.

67. Huawei's litigation and its request for injunctive relief breach Huawei's FRAND commitments. Huawei initiated litigation before making any licensing offer to T-Mobile. Further, Huawei has requested injunctive relief before any FRAND rate has been offered or established for the Asserted Patents.

68. Huawei's communications to T-Mobile, its litigation tactics, and its pursuit of injunctive relief shows its intent to gain leverage to coerce T-Mobile into agreeing to non-FRAND terms and conditions for a license to Huawei's entire portfolio without an opportunity to contest whether Huawei's declared SEPs are actually used by T-Mobile and valid. Huawei is seeking to obtain royalties based on hold-up rather than the incremental value of the Asserted Patents.

69. Huawei's conduct is injuring competition and consumers both in the relevant Input Technology Markets and in downstream markets for standard-compliant cellular services and devices. Through its breach of its FRAND commitments, communications with T-Mobile,

litigation tactics, and seeking injunctive relief, Huawei has threatened and brought about anticompetitive effects, including but not limited to:

- Decreased incentives for suppliers of downstream standard-compliant products and services, including other network operators, network equipment suppliers, and suppliers of handsets, to invest in, develop, and bring to market new and innovative products;
- Increasing costs to provide cellular services and products that that comply with the relevant cellular standards, which will likely be passed on to consumers; and
- Contravening ETSI's IPR Policy and undermining the integrity and efficiency of the standard-setting process and decreasing incentives to participate. Among other things, potential participants will be unable to have confidence that holders of declared SEPs will not exploit the standardization process to exercise hold-up power and extract non-FRAND royalties and other terms from standard implementers, thereby impeding the adoption of cellular standards.

70. Huawei itself has recognized the pernicious effects caused by seeking exclusionary remedies on FRAND-committed patents. In a 2013 submission to the U.S. International Trade Commission about how it would be against the public interest to issue an exclusion order on FRAND-committed patents, Huawei outlined the "harm [to] competitive conditions in the U.S. economy" that even the threat of such relief causes:

- "**Harm to innovation.** Threatened exclusion orders encourage royalty demands by SEP holders that reduce expected returns to investment by others, including complementary SEP holders. Both actual exclusion and excessive bargaining power undermine incentives for innovation in a host of complementary technologies, services and products—patented and not— especially if the most successful licensees are targeted."

- "**Loss of consumer welfare from inflated royalties.** Holdup power based on threatened exclusion orders biases bargaining power in favor of SEP holders. Resulting terms and royalties are detached from the contribution of the patented technology and may well exceed reasonable levels. Excessive royalties directly harm implementers, and also harm downstream consumers when royalties are passed through to consumers."
- "**Slowdown and compromise of standards process.** Holdup power created by the threat of exclusion orders strengthens the "vested interest" incentive to maneuver to get one's patented technology into the standard and to resist the inclusion of others' patented technologies, regardless of technological merits. This conflict is likely to exacerbate delays in the consensus standards process, and to make it harder for SSOs to choose the technically best solutions."

**Huawei and T-Mobile's Post-Litigation Communications and Huawei's Unlawful Portfolio Only Licensing Scheme**

71. Following Huawei's decision to initiate litigation without making any licensing offer to T-Mobile, T-Mobile has repeatedly requested that Huawei provide its FRAND rates for the asserted patents in this case as well as in each of the three other pending litigations.

72. Huawei has refused repeated requests to provide FRAND rates specific to any of the patents that it has asserted against T-Mobile. Instead, on April 1, 2016, Huawei purported to offer a license to all Huawei U.S. patents for 4G. Huawei's demand also included payment by T-Mobile to Huawei of a "Past Release Amount" for the period from January 1, 2013 to the effective date of January 1, 2016.

73. Notably, although Huawei had earlier suggested it could not make a licensing offer to T-Mobile without first entering a non-disclosure agreement, no such agreement was in place on

April 1, 2016 when Huawei first made what Huawei purports to be an offer—months after it had sued T-Mobile and accused T-Mobile of being an unwilling licensee.

74. Upon information and belief—including Huawei's refusal to provide any information to the contrary despite repeated requests—Huawei has discriminatorily singled out T-Mobile among cellular service providers as a licensing and litigation target.

**Huawei Has Engaged In An Unlawful Double-Recovery Scheme**

75. Telefonaktiebolaget LM Ericsson and Ericsson Inc. ("Ericsson") have intervened in this case because, according to Ericsson, "Huawei seeks an injunction and monetary damages based on allegations that appear directed, at least in part, to equipment supplied to T-Mobile by Ericsson." Dkt. 95 at 2.

76. In January 2016, Huawei announced that Huawei and Ericsson "have agreed on extending their global patent license agreement between the two companies. The agreement includes a cross license that covers patents relating to both companies' wireless standard-essential patents (including the GSM, UMTS and LTE cellular standards). Under the agreement, both companies are able to access and implement the other company's standard essential patents and technologies globally."

77. Huawei has authorized Ericsson to sell network equipment that embodies Huawei's declared SEPs through its license agreement. That agreement provides T-Mobile with rights to practice Huawei's claimed SEPs when using licensed Ericsson network equipment.

78. Nokia Solutions and Networks US LLC and Nokia Solutions and Networks Oy (collectively, "Nokia") have also intervened in this case because T-Mobile is "one of NSN US's largest customers" and "NSN US provides T-Mobile with many types of network equipment that Huawei Technologies identifies in its complaint, including HSSs, MMEs, SGSNs, RNCs, and eNodeBs." Dkt. 32 at 1-2.

79. In 2008, Nokia announced "a patent license agreement with Huawei and its affiliates for standards essential patents. The comprehensive agreement covers the worldwide use of all standards essential patents of all parties, including GSM, WCDMA, CDMA2000, optical networking, datacom and WiMAX in mobile devices, infrastructure and services."

80. The doctrine of patent exhaustion provides that when a patentee authorizes the sale of a patented product, the sale "exhausts" all of the patentee's rights in patents that are substantially embodied by that product, "terminat[ing] all of patent rights in that item." *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 625 (2008). Huawei has already been compensated once by Ericsson and Nokia for use of its declared-essential patents in Ericsson or Nokia network equipment through the consideration that it received in its cross-licenses with Ericsson and Nokia. Accordingly, Huawei is not entitled to a second recovery for the use of those same patents by collecting royalties from T-Mobile for T-Mobile's use of licensed Ericsson and Nokia equipment.

81. For any period during which T-Mobile has or is using licensed Ericsson or Nokia network equipment and for which Huawei seeks double recovery through "exhausted" patents, Huawei is seeking to extend its patent rights beyond their proper legal scope. Such an over-expansion of Huawei's patent rights undermines competition for the provision of products and services that support cellular standard.

82. Further, charging a second royalty to T-Mobile after already collecting royalties from T-Mobile's vendors is unreasonable and unfair.

**The Federal Trade Commission's Enforcement Actions For SSO Misconduct**

83. The Federal Trade Commission ("FTC") has recognized that the type of SSO misconduct Huawei has committed violates Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act").

84. First, the FTC has recognized that an SSO member's failure to disclose the existence of intellectual property rights relevant to an industry standard violates Section 5 of the FTC Act. For example, in a complaint against Dell Computer Corporation, the FTC alleged that Dell's deception of an SSO regarding the existence of patents relating to the standard and subsequent assertion of those patents against implementers of the standard constituted unfair methods of competition that "restrained competition" in violation of Section 5.

85. Second, the FTC has recognized that threatening or obtaining injunctions on FRAND-committed patents against willing licensees violates Section 5 of the FTC Act. For example, in a complaint against Google Inc. and Motorola Mobility LLC for violations of Section 5 of the FTC Act, the FTC alleged the following conduct by Google:

> [T]he Commission challenges a course of conduct, whereby Google, and its predecessor in interest, Motorola Mobility, Inc. ("Motorola"), engaged in unfair methods of competition by breaching its commitments to standard-setting organizations ("SSOs") to license its standard essential patents ("SEPs") on fair, reasonable, and nondiscriminatory ("FRAND") terms. Google violated its FRAND commitments by seeking to enjoin and exclude willing licensees of its FRAND- encumbered SEPs.
>
> . . . .
>
> Google's conduct will harm consumers by either excluding products from the market entirely as a result of an injunction, or by leading to higher prices because manufacturers using Google's SEPs would be forced, by the threat of an injunction, to pay higher royalty rates which would be passed on to consumers. This conduct will deter innovation by increasing the costs of manufacturing to a standard and undermining the integrity and value of the standard-setting process.

> Left unchecked, such conduct may in the future cause or threaten to cause substantial injury to competition and to consumers.
>
> . . . .
>
> Motorola breached its FRAND obligations by seeking to enjoin and exclude implementers of its SEPs, including some of its competitors, from marketing products compliant with some or all of the Relevant Technology Standards. Google continued Motorola's exclusionary campaign after acquiring Motorola. Google used these threats of exclusion orders and injunctions to enhance its bargaining leverage against willing licensees and demand licensing terms that tended to exceed the FRAND range. At all times relevant to this Complaint, these implementers were willing licensees of Google's FRAND-encumbered SEPs.
>
> . . . .
>
> Motorola also filed for, and Google prosecuted, claims for injunctive relief related to its FRAND-encumbered SEPs in federal district court in parallel with its ITC filings. *See* Complaint, *Motorola Mobility, Inc. v. Apple, Inc.*, No. 1:10-cv-6385, slip op. at 10 (E.D. Ill. Oct. 6, 2010); Complaint for Patent Infringement, *Motorola Mobility, Inc. v. Microsoft Corp.*, No. 10-cv-699, slip op. at 8 (W.D. Wis. Nov. 10, 2010); Complaint for Patent Infringement, *Motorola Mobility, Inc. v. Microsoft Corp.*, No. 10-cv-700, slip op. at 12 (W.D. Wis. Nov. 10, 2010); Complaint for Patent Infringement, *Motorola Mobility, Inc. v. Microsoft Corp.*, No. 1:10-cv-24063, slip op. at 14 (S.D. Fla. Nov. 10, 2010).

The FTC ultimately entered a consent decree with Google that prohibited Google from seeking injunctions on FRAND-committed patents except in exceptional circumstances.

86. Likewise, the FTC issued a complaint against Robert Bosch GmbH that alleged a violation of Section 5 of the FTC Act based on the seeking of an injunction for a FRAND-committed patent, which the FTC deemed a "breach" of that commitment: "SPX Service Solutions' breach of its commitment to offer licenses its standard-essential patents pursuant to its obligations under 1.14 of the SAE Policy Manual by seeking injunctive relief over the same standard-essential patents, would exclude its competitors from the market, have caused, or threaten to cause, harm to competition and will continue to do so unless the relief requested herein

is granted. SPX Service Solutions' conduct, if left unchecked, tends to undermine the vitality of the standard-setting process."

87. Third, the FTC has recognized that reneging on FRAND commitments can violate Section 5 of the FTC Act. In 2008, the FTC filed a complaint against Negotiated Data Solutions LLC in which it alleged that Negotiated Data "and its predecessor in interest, Vertical Networks, Inc. ('Vertical'), engaged in unfair acts or practices and unfair methods of competition through which it sought to break a licensing commitment that its predecessor, National Semiconductor ('National'), made to the Institute of Electrical and Electronics Engineers ('IEEE'), a standard setting organization, in 1994." Specifically, the FTC alleged that although National had committed to license patents essential to an IEEE standard for $1,000, Vertical sought to rescind that commitment and sought licensing royalties at a "substantial increased over National's commitment to license the NWay technology for a one-time fee of one thousand dollars."

88. The FTC concluded that this breach of a licensing commitment caused or threatened to cause substantial harm to competition and consumers, including "increased royalties (or other payments) associated with the manufacture, sale, use or importation of products that implement an IEEE standard enabling autonegotiation by or with 802.3 compliant products," "increases in price and/or reductions in the use or output of products that implement an IEEE standard enabling autonegotiation by or with 802.3 compliant products," "decreased incentives on the part of semiconductor chip and LAN equipment manufacturers to produce products that implement IEEE standards enabling autonegotiation by or with 802.3 compliant products," "decreased incentives on the part of semiconductor chip and LAN equipment manufacturers and others to participate in IEEE or other standard setting activities," and "both within and outside the

semiconductor chip and LAN equipment industries decreased reliance, or willingness to rely, on standards established by industry standard setting organizations."

**The Anticompetitive Effects of Huawei's Abusive Licensing Conduct**

89. As set forth above in paragraphs 47 to 55, Huawei possesses monopoly power in the Input Technology Markets to the extent that it holds patents that cover the technologies that perform each of those standardized functions or, in the alternative, until those patents are ultimately determined not to be essential (or found unenforceable or invalid).

90. Huawei has conditioned a license to the Asserted Patents on T-Mobile agreeing to a license to its entire U.S. portfolio of patents purportedly essential to the 4G standard—irrespective of whether or not T-Mobile wants to license those patents, that Huawei committed to license each FRAND-committed patent individually, and whether or not T-Mobile is already authorized to practice the patents. Huawei has abusively sought injunctions through serial litigations (in this case and three other cases filed on the same day) against T-Mobile to further its anticompetitive scheme and increase its improper leverage against T-Mobile notwithstanding that Huawei committed to ETSI to license the Asserted Patents on FRAND terms. Huawei is attempting to leverage the hold-up power for the Asserted Patents that it promised to relinquish through its FRAND commitments by threatening to remove T-Mobile from the market.

91. Through its unlawful conduct against T-Mobile, Huawei has caused, or threatens to cause, harm to competition and will continue to do so unless the relief requested herein by T-Mobile is granted. That harm includes the types of harm that the FTC has recognized is caused by such conduct, including: (a) increasing royalties for 4G FRAND-committed patents beyond the value of the patented technology to reflect hold-up value, (b) increasing prices for consumers or reduced output of 4G services and products, (c) decreased incentives to produce services or products that support the 4G standard, (d) decreased incentives for industry members to participate

in standard setting at ETSI or 3GPP, and (e) more broadly, decreased incentives for participation in other standard setting and willingness to rely on standardized technology.

**FIRST COUNT**

**(Breach of Contract – FRAND and Other Standard-Related Misconduct)**

92. T-Mobile realleges paragraphs 1-91 as if fully set forth herein.

93. Initially, as an independent breach of its contractual obligations to ETSI, and to T-Mobile, Huawei failed to timely disclose its allegedly essential patents in accordance with the requirements of the ETSI IPR Policy.

94. As described above, by eventually committing to license its declared-essential patents on FRAND terms to all parties practicing the 4G standard, Huawei entered into contractual commitments with ETSI obligating it to license ETSI's members (including T-Mobile) and suppliers of products that support the 4G standard (as third-party beneficiaries). Huawei's FRAND commitments impose ongoing, continuing contractual obligations on Huawei.

95. By initiating litigation and seeking injunctive relief against T-Mobile before making any licensing offer, Huawei has breached its FRAND commitment to be prepared to license the Asserted Patents. In particular, seeking injunctive relief on the FRAND-committed Asserted Patents is directly contrary to Huawei's commitment to license the patents to all companies using the 4G standard.

96. In addition, by failing to provide T-Mobile with FRAND license terms for each of the Asserted Patents—even after bringing litigations and after T-Mobile has requested such terms—Huawei has breached its FRAND commitments specific to each of the Asserted Patents. T-Mobile's claim for breach of Huawei's FRAND commitments is specific to the Huawei Asserted Patents and does not address whether or not Huawei has offered FRAND terms to T-Mobile on a portfolio-wide basis.

97. As a result of these multiple contractual breaches, T-Mobile has been injured, including in its business or property. T-Mobile has been forced to defend groundless infringement suits and has incurred substantial expense in doing so.

## SECOND COUNT

### (Violation of Texas Unfair Competition Law)

98. T-Mobile realleges paragraphs 1 through 97 as if fully set forth herein.

99. Huawei's unlawful, anticompetitive, and unfair conduct constitutes unfair competition under Texas law and has interfered or threatens to interfere with competition and T-Mobile's ability to conduct its business.

100. Huawei has committed unlawful and unfair acts that constitute violations of Section 5 of the FTC Act, including: (a) failing to timely disclose the existence of patent or patent applications related to the Asserted Patents in accordance with the requirements of the ETSI IPR Policy, (b) seeking to enjoin T-Mobile with the Asserted Patents for which Huawei has made FRAND commitments in order to gain improper negotiating leverage, (c) failing to abide by its FRAND commitments, including (in addition to seeking injunctions through serial litigations) refusing to license the Asserted Patents on an individual basis on FRAND terms and conditions and pursuing claims against T-Mobile relating to products and services licensed under T-Mobile's vendors' licenses with Huawei.

101. As a direct, proximate, and foreseeable result of Huawei's unfair and wrongful conduct, as alleged above, there is a significant threat of injury to downstream price, quality, innovation, and consumer choice for cellular services and products, thereby causing injury to consumers in Texas and elsewhere. As described more fully in paragraph 69, these threatened injuries include the inevitable passing on to consumers of improper royalties demanded by Huawei and decreases in innovation, quality, and consumer choice for products and services that support

the 4G standard, as well as decreased incentives to participate in standard setting generally and to support products that rely on standards.

102. As a direct, proximate, and foreseeable result of Huawei's unfair and wrongful conduct, as alleged above, Huawei has interfered with T-Mobile's ability to do business in Texas and elsewhere by, among other things: (a) causing T-Mobile to face a threat of loss of profits and loss of customers and potential customers for cellular services; and (b) being forced to expend money and other resources defending against Huawei's actions for injunctions notwithstanding that Huawei has committed to license the Asserted Patents on FRAND terms.

**THIRD COUNT**

**(Violation of Washington Consumer Protection Act)**

103. T-Mobile realleges paragraphs 1 through 102 as if fully set forth herein.

104. Huawei's unlawful, anticompetitive, and unfair conduct constitutes unfair competition within the meaning of the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020 *et seq.*, that has interfered or threatens to interfere with competition and T-Mobile's ability to conduct its business.

105. Huawei's conduct constitutes unfair methods of competition and/or unfair or deceptive acts or practices in violation of RCW 19.86.020, including: (a) failing to timely disclose the existence of patent or patent applications related to the Asserted Patents in accordance with the requirements of the ETSI IPR Policy, (b) seeking to enjoin T-Mobile with the Asserted Patents for which Huawei has made FRAND commitments in order to gain improper negotiating leverage, (c) failing to abide by its FRAND commitments, including (in addition to seeking injunctions through serial litigations) refusing to license the Asserted Patents on an individual basis on FRAND terms and conditions and pursuing claims against T-Mobile relating to products and services licensed under T-Mobile's vendors' licenses with Huawei.

106. As a direct, proximate, and foreseeable result of Huawei's unfair and wrongful conduct, as alleged above, there is a significant threat of injury to downstream price, quality, innovation, and consumer choice for cellular services and products, thereby causing injury to consumers in Washington and elsewhere. As described more fully in paragraph 69, these threatened injuries include the inevitable passing on to consumers of improper royalties demanded by Huawei and decreases in innovation, quality, and consumer choice for products and services that support the 4G standard, as well as decreased incentives to participate in standard setting generally and to support products that rely on standards.

107. As a direct, proximate, and foreseeable result of Huawei's unfair and wrongful conduct, as alleged above, Huawei has interfered with T-Mobile's ability to do business in Washington and elsewhere by, among other things: (a) causing T-Mobile to face a threat of loss of profits and loss of customers and potential customers for cellular services; and (b) being forced to expend money and other resources defending against Huawei's actions for injunctions notwithstanding that Huawei has committed to license the Asserted Patents on FRAND terms.

**FOURTH COUNT**

**(Declaratory Judgment of Non-Infringement of U.S. Patent No. 8,531,971)**

108. T-Mobile realleges paragraphs 1 through 107 as if fully set forth herein.

109. T-Mobile has not infringed and does not infringe, directly or indirectly, any valid claim of the '971 patent, either literally or under the doctrine of equivalents.

110. In paragraph 42 of its Complaint, Huawei has alleged that "T-Mobile has directly infringed at least claims 1 and 5 of the '971 patent."

111. There exists a substantial immediacy and reality to warrant the issuance of a declaratory judgment as to whether T-Mobile infringes any valid claim of the '971 patent.

112. A judicial declaration is necessary and appropriate so that T-Mobile may ascertain its rights regarding the '971 patent.

113. T-Mobile is entitled to a judicial declaration that it has not infringed and does not infringe any valid claim of the '971 patent.

**FIFTH COUNT**

**(Declaratory Judgment of Invalidity of U.S. Patent No. 8,531,971)**

114. T-Mobile realleges paragraphs 1 through 113 as if fully set forth herein.

115. None of the asserted claims of the '971 patent is valid because the claims fail to meet the conditions of patentability and/or otherwise comply with one or more provisions of 35 U.S.C. §§ 101 et seq., including 35 U.S.C. §§ 101, 102, 103, 112, and/or 116.

116. In paragraph 41 of its Complaint, Huawei has alleged that the '971 patent is valid.

117. There exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaration judgment as to whether the asserted claims of the '971 patent are valid.

118. T-Mobile is entitled to a judicial determination that the asserted claims of the '971 patent are invalid.

**SIXTH COUNT**

**(Declaratory Judgment of Non-Infringement of U.S. Patent No. 8,798,575)**

119. T-Mobile realleges paragraphs 1 through 118 as if fully set forth herein.

120. T-Mobile has not infringed and does not infringe, directly or indirectly, any valid claim of the '575 patent, either literally or under the doctrine of equivalents.

121. In paragraph 53 of its Complaint, Huawei has alleged that "T-Mobile has directly infringed at least claims 1 and 8 of the '575 patent."

122. There exists a substantial immediacy and reality to warrant the issuance of a declaratory judgment as to whether T-Mobile infringes any valid claim of the ’575 patent.

123. A judicial declaration is necessary and appropriate so that T-Mobile may ascertain its rights regarding the ’575 patent.

124. T-Mobile is entitled to a judicial declaration that it has not infringed and does not infringe any valid claim of the ’575 patent.

**SEVENTH COUNT**

**(Declaratory Judgment of Invalidity of U.S. Patent No. 8,798,575)**

125. T-Mobile realleges paragraphs 1 through 124 as if fully set forth herein.

126. None of the asserted claims of the ’575 patent is valid because the claims fail to meet the conditions of patentability and/or otherwise comply with one or more provisions of 35 U.S.C. §§ 101 et seq., including 35 U.S.C. §§ 101, 102, 103, 112, and/or 116.

127. In paragraph 52 of its Complaint, Huawei has alleged that the ’575 patent is valid.

128. There exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaration judgment as to whether the asserted claims of the ’575 patent are valid.

129. T-Mobile is entitled to a judicial determination that the asserted claims of the ’575 patent are invalid.

**EIGHTH COUNT**

**(Declaratory Judgment of Non-Infringement of U.S. Patent No. 8,325,675)**

130. T-Mobile realleges paragraphs 1 through 129 as if fully set forth herein.

131. T-Mobile has not infringed and does not infringe, directly or indirectly, any valid claim of the ’675 patent, either literally or under the doctrine of equivalents.

132. In paragraph 64 of its Complaint, Huawei has alleged that "T-Mobile has directly infringed at least claims 1 and 6 of the '675 patent."

133. There exists a substantial immediacy and reality to warrant the issuance of a declaratory judgment as to whether T-Mobile infringes any valid claim of the '675 patent.

134. A judicial declaration is necessary and appropriate so that T-Mobile may ascertain its rights regarding the '675 patent.

135. T-Mobile is entitled to a judicial declaration that it has not infringed and does not infringe any valid claim of the '675 patent.

## NINTH COUNT

**(Declaratory Judgment of Invalidity of U.S. Patent No. 8,325,675)**

136. T-Mobile realleges paragraphs 1 through 135 as if fully set forth herein.

137. None of the asserted claims of the '675 patent is valid because the claims fail to meet the conditions of patentability and/or otherwise comply with one or more provisions of 35 U.S.C. §§ 101 et seq., including 35 U.S.C. §§ 101, 102, 103, 112, and/or 116.

138. In paragraph 63 of its Complaint, Huawei has alleged that the '675 patent is valid.

139. There exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaration judgment as to whether the asserted claims of the '675 patent are valid.

140. T-Mobile is entitled to a judicial determination that the asserted claims of the '675 patent are invalid.

## TENTH COUNT

**(Declaratory Judgment of Non-Infringement of U.S. Patent No. 8,908,627)**

141. T-Mobile realleges paragraphs 1 through 140 as if fully set forth herein.

142. T-Mobile has not infringed and does not infringe, directly or indirectly, any valid claim of the ’627 patent, either literally or under the doctrine of equivalents.

143. In paragraph 75 of its Complaint, Huawei has alleged that “T-Mobile has directly infringed at least claims 1, 4, and 7 of the ’627 patent.”

144. There exists a substantial immediacy and reality to warrant the issuance of a declaratory judgment as to whether T-Mobile infringes any valid claim of the ’627 patent.

145. A judicial declaration is necessary and appropriate so that T-Mobile may ascertain its rights regarding the ’627 patent.

146. T-Mobile is entitled to a judicial declaration that it has not infringed and does not infringe any valid claim of the ’627 patent.

## ELEVENTH COUNT

### (Declaratory Judgment of Invalidity of U.S. Patent No. 8,908,627)

147. T-Mobile realleges paragraphs 1 through 146 as if fully set forth herein.

148. None of the asserted claims of the ’627 patent is valid because the claims fail to meet the conditions of patentability and/or otherwise comply with one or more provisions of 35 U.S.C. §§ 101 et seq., including 35 U.S.C. §§ 101, 102, 103, 112, and/or 116.

149. In paragraph 74 of its Complaint, Huawei has alleged that the ’627 patent is valid.

150. There exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaration judgment as to whether the asserted claims of the ’627 patent are valid.

151. T-Mobile is entitled to a judicial determination that the asserted claims of the ’627 patent are invalid.

## PRAYER FOR RELIEF

152. Plaintiff requests that the Court:

a. Adjudge and decree that Huawei is liable for breach of contract;

b. On T-Mobile's First Count, enter judgment against Huawei for the amount of damages T-Mobile proves at trial;

c. On T-Mobile's Second Count, enter judgment that Huawei has violated the Texas common law of unfair competition by engaging in unfair and unlawful acts; enjoin Huawei from further violations of the law, specifically including prohibiting it from seeking or continuing to seek injunctions against T-Mobile on patents for which Huawei has made FRAND commitments; declare each of the Asserted Patents invalid, void, and without any force or effect including against T-Mobile; and award the amount of damages T-Mobile proves at trial;

d. On T-Mobile's Third Count, enter judgment that Huawei has violated the Washington Consumer Protection Act by engaging in unfair and unlawful acts; enjoin Huawei from further violations of the law, specifically including prohibiting it from seeking or continuing to seek injunctions against T-Mobile on patents for which Huawei has made FRAND commitments; declare each of the Asserted Patents invalid, void, and without any force or effect including against T-Mobile; and award the amount of damages T-Mobile proves at trial;

e. Find and declare that T-Mobile has not infringed and is not infringing each of Huawei's Asserted Patents;

f. Find and declare that each of Huawei's Asserted Patents is invalid;

g. Award to T-Mobile its costs and expenses associated with this case, together with interest; and

h. Grant such other and further relief as the Court may deem just and proper under the circumstances.

## **JURY DEMAND**

T-Mobile demands a jury trial on all issues and claim so triable.

December 6, 2016

*/s/ E. Glenn Thames, Jr.*

Mark D. Selwyn
(California Bar No. 244180)
Kathryn D. Zalewski
(California Bar No. 263119)
WILMER CUTLER PICKERING HALE
AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Tel. 650-858-6000

Joseph J. Mueller
(Massachusetts Bar No. 647567)
Cynthia Vreeland
(Texas Bar No. 20625150
Massachusetts Bar No. 635143)
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA 02109
Tel. 617-526-6000

Michael E. Jones
Texas Bar No. 10929400
mikejones@potterminton.com
E. Glenn Thames, Jr.
Texas Bar No. 00785097
glennthames@potterminton.com
**POTTER MINTON**
**A PROFESSIONAL CORPORATION**
110 North College Avenue, Suite 500
Tyler, TX 75702
Tel. 903-597-8311
Fax 903-593-0846

*Attorneys for Defendants T-Mobile US, Inc. and T-Mobile USA, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with this document via the Court's CM/ECF system pursuant to Local Rule CV-5(a) on December 6, 2016. All other counsel will be served by U.S. first-class mail.

*/s/ E. Glenn Thames, Jr.*
E. Glenn Thames, Jr.