# EXHIBIT A

**THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **HUAWEI TECHNOLOGIES CO. LTD.,** | |
| **Plaintiff,** | |
| **v.** | |
| **T-MOBILE US, INC. and T-MOBILE USA, INC.,** | Civil Action No. **2:16-cv-00052-JRG-RSP**<br>Civil Action No. **2:16-cv-00055-JRG-RSP**<br>Civil Action No. **2:16-cv-00056-JRG-RSP**<br>Civil Action No. **2:16-cv-00057-JRG-RSP** |
| **Defendants,** | |
| **NOKIA SOLUTIONS AND NETWORKS US LLC, NOKIA SOLUTIONS AND NETWORKS OY, TELEFONAKTIEBOLAGET LM ERICSSON, and ERICSSON INC.,** | **JURY TRIAL DEMANDED** |
| **Intervenors.** | |

## REBUTTAL EXPERT REPORT AND DECLARATION OF PROFESSOR PHILIPPE STOFFEL-MUNCK

I declare under penalty of perjury under the laws of the United States of America that the

following is true and correct.  Executed on June 30, 2017 at Paris, France by:

_____

PHILIPPE STOFFEL-MUNCK

# **Table of Contents**

I.    INTRODUCTION ................................................................................................. 1

II.   MATERIALS REVIEWED AND ISSUES CONSIDERED ................................. 3

III.  THE ANALYTICAL FRAMEWORK A FRENCH COURT WOULD APPLY IN INTERPRETING THE CONTRACTS AT ISSUE ............................................... 4

IV.   PRINCIPLES OF FRENCH CONTRACT LAW ................................................. 6

V.    APPLICATION OF FRENCH CONTRACT LAW PRINCIPLES TO THE ETSI IPR POLICY .......................................................................................................... 10

      A.    Interpretation of ETSI IPR Policy Section 4.1 as to "Timely" Disclosure ................... 10

      B.    Interpretation of ETSI IPR Policy as to Portfolio vs Patent-by-Patent License Offers . 16

      C.    Are Third Parties Beneficiaries of an ETSI Member's Obligation to "Inform ETSI of ESSENTIAL IPRs in a Timely Fashion?" .................................................................... 20

      D.    Remedies for Breach of ETSI Obligations ................................................................. 23

I, Philippe Stoffel-Munck, declare as follows:

I.    <u>INTRODUCTION</u>

1.    I am over the age of 21 and fully competent to make this declaration.  I have personal knowledge of the facts stated herein and they are all true and correct.  I have been retained as an expert in these cases by Huawei Technologies Co. Ltd. ("Huawei").  The opinions and conclusions stated herein are my own and represent my analysis of the issues I have been asked to consider.

2.    My professional curriculum vitae is attached as Exhibit 1.  I am being compensated for my time at the rate of €650 Euros per hour for each hour I am spending in connection with this report and any related testimony.  My compensation is not dependent on the outcome of the litigation or the substance of my opinions.  If requested, I expect to be available for deposition and to testify in court about the opinions in this report.

3.    I am currently a Professor at the University of Paris I (Pantheon-Sorbonne) where I teach classes in private civil law, including the subject matter of French contract law.  Specifically, I have specialized in the application of French civil law as applied to business law, in particular contractual interpretation, business obligations, and credit law.  I have been a Professor in private law for more than 15 years as shown in my CV.  I have a PhD in private law from the Faculty of Law of Aix-en-Provence, where I wrote a thesis relating to contract law, entitled "L'Abus dans le contrat, Essai d'une théorie."

4.    I earned my Ph.D. in law, and have been an "Agrégé des Facultés de droit" since 2001, which is the highest national competitive examination in France to be admitted as University Professor in Law.  Since 2005, I have been a Full Professor at the University of Panthéon-Sorbonne (Paris I).  I teach private law, law of contracts, tort law, and law of security interests.  I

1

have also lectured, as a guest professor, at the Universities of Montreal (2007), Waseda (Tokyo, 2011), and Oxford (2013), among other places.

5.      I write or co-author the biannual "Torts and Contractual Liability" column in *La Semaine Juridique* and the "Contract Law" column in *Revue des contrats*, as well as in *Droit et Patrimoine*, all three being prominent law journals in France.  I have also written or co-authored the following legal textbooks:   *Les obligations* (with Ph. Malaurie and L. Aynès, coll. Droit civil, 8th ed., LGDJ, 2016), and *Droit de la responsabilité et des contrats* (directed by. Ph. le Tourneau, Dalloz Action, 2008), which are amongst the most used textbooks in their respective areas, and *L'abus dans le contrat* (LGDJ 2000).  I also supervised the collective book studying the draft reform of French contract Law *Réforme du droit des contrats et pratique des affaires* (Dalloz, 2015).[1]

6.      In addition to my academic work, I also have practical experience with French contract law.  For example, I act as an arbitrator in domestic and international cases in ad hoc proceedings, as well as under the rules of arbitral institutions such as the ICC.  I further have substantial prior experience as a consultant and legal expert in French law before French courts, as well as before international arbitral tribunals in numerous cases, and also before the High Court of England and Wales.  Over the last decade, I have worked with many of the international law firms that have an office in Paris and many of the prominent domestic law offices.[2]

---

[1] Translated into English, these textbooks are as follows:  "*The obligations*"; "*Liability and contracts*"; "*Abuse in contract*"; and "*Reform of contract law and business practice*."

[2] For example, international law firms with which I have worked include Brown & Rudnick, Clifford Chance, Davis Polk, Eversheds, Dechert, Dentons, Gide, Hogan Lovells, Jones Day, K&L Gates, Latham & Watkins, Linklaters, Mayer Brown, Olswang, Orrick, Quinn Emmanuel, Shearman Sterling, Sheppard Mullin, Weil Gotshal, and White & Case.

7.      A list of all publications I have authored in the previous ten years is included in my CV

(Exhibit 1).  Attached as Exhibit 2 is a list of all cases in the previous four years where I have

testified in deposition or at trial.

II.      MATERIALS REVIEWED AND ISSUES CONSIDERED

8.      I have reviewed the June 5, 2017 expert report of Nicolas Molfessis Regarding French

Contract Law ("the Molfessis Report").  In paragraph 10-27 of the Molfessis Report, Professor

Molfessis identifies basic principles of French contract law.  When stated in general terms as in

the Molfessis Report, I largely agree with the description of these general principles.  However,

with respect to the issues discussed in my report below, I disagree with the applications of these

principles to the ETSI IPR Policy agreement at issue, and disagree with the conclusions drawn in

the report.  In addition, the Molfessis Report omits important aspects of French contract law that

a French court would utilize in interpreting the ETSI IPR Policy agreement and below I describe

those aspects and their application in this matter.  Specifically, I address how a French Court

would consider the custom and practice of ETSI members—who are the parties to the ETSI IPR

Policy—to understand the intent of the provisions of the ETSI IPR Policy.

9.      I have been asked to address the following issues related to the Molfessis Report:

      a.      How would a French Court interpret Sections 4.1 and 4.2 of the 1997 ETSI IPR

            Policy[3] with respect to the phrase "*timely inform* ETSI of ESSENTIAL IPRs?"

      b.      Does the 1997 ETSI IPR Policy require members to offer licenses on an

            individual patent-by-patent basis?

_____

[3] I focus on the 1997 ETSI IPR Policy because that is the version which the Molfessis Report
references.  I have also reviewed the most current version, dated 5 April 2017, and my
interpretation of the ETSI provisions discussed herein applies equally to the current version.  So
as to reflect the actual meaning of those provisions, I have from time to time taken argument
from clarifications introduced by ETSI in the IPR Policy throughout the years.

3

      c.      Are third parties beneficiaries of an ETSI Member's obligation to "inform ETSI of essential IPRs in a timely fashion?"

      d.      If Huawei were found to have not timely disclosed an ESSENTIAL IPR, what remedies would be available under 1997 ETSI IPR Policy in accordance with French contract law?

10.      A list of materials considered is attached as Exhibit 3.

III.      <u>THE ANALYTICAL FRAMEWORK A FRENCH COURT WOULD APPLY IN INTERPRETING THE CONTRACTS AT ISSUE</u>

11.      I agree with Professor Molfessis that, under French law,[4] the general requirements for contract formation are: "The consent of the party who binds himself; His capacity to contract; A definite object which forms the subject-matter of the undertaking; [and] A lawful cause in the obligation." *See* Exhibit 4 (English translation of 1 July 2013 French Civil Code) at Article 1108.[5] Most importantly, a contract is based on the meeting of concurring wills: not only do both parties have to be willing to enter into the contract, but they also have to be willing to do so together, and their wills have to meet with respect to the same content.

12.      Because a contract in French law is based on the will of the contracting parties, the fundamental principle governing the formation of contracts is the "freedom of contract principle," under which no individual or entity can be a party to a contract if they do not so

---

[4] The most recent version of the French Civil Code (dated 2 Mar. 2017) is available in French at https://www.legifrance.gouv.fr/affichCode.do;jsessionid=081FCCE6230B38D385FB3DA62153 CAF0.tpdila11v_1?cidTexte=LEGITEXT000006070721&dateTexte=20160506.

[5] In French: "*Quatre conditions sont essentielles pour la validité d'une convention: Le consentement de la partie qui s'oblige; Sa capacité de contracter; Un objet certain qui forme la matière de l'engagement; Une cause licite dans l'obligation.*"

intend.  *See* Exhibit 5 (J. Flour, J.-L. Aubert and E. Savaux,. *Les obligations*, *L'acte juridique*, 16th ed., Sirey 2014) at No. 123, p. 113 ("No contract can be formed without one and another party to have wanted it, moreover against the will of one of the parties."); Exhibit 6 (Fr. Terre, Ph. Simler and Y. Lequette, *Les obligations*, 11th ed., Dalloz 2013) at No. 24, p. 33 ("Everyone has the right to refuse to sell the goods he owns or to employ someone he does not want.  The refusal to contract is a manifestation of freedom.").

13.     This principle is also reflected in a number of other principles, e.g.: "As to the merit, freedom of contract is expressed through a threefold capacity: to contract or not, to freely choose the other party, to freely determine the content of the contract."  Exhibit 6 (*Les obligations*) at No. 24, p. 33; *see also* Exhibit 5 (*Les obligations*, *L'acte juridique*) at No. 123, p. 113.

14.     I also note that French contract Ordonnance number 2016-131, dated February 10, 2016, has recently modified the Civil Code by restating the legal rules regarding contract.  New Article 1102, effective from October 1, 2016, is consistent with past and current case law and expresses the aforementioned principle clearly: "Every person is free to contract or not to contract, to choose its contracting partner and to determine the content and the form of the contract, within the limits fixed by the law."[6]  *See, e.g.*, Exhibit 7 (English translation of Draft Ordonnance for the Reform of the Law of Contract).

15.     I also agree with Professor Molfessis that there are no formal requirements regarding the form of consent.  *See* Molfessis Report ¶ 14.  The general principle of "*consensualisme*" states that contracts result from a simple meeting of will.  But this principle is sometimes modified by the law itself.  For instance, as stated by the Intellectual Property Code, a patent license is a

---

[6] In French: "*Chacun est libre de contracter ou de ne pas contracter, de choisir son cocontractant et de déterminer le contenu et la forme du contrat dans les limites fixées par la loi.*"

formal contract.  Thus, it exists only if it is made in writing, under the penalty of nullity.  *See* Intellectual Property Code, Article L 613-8, § 5.

16.     I further agree with Professor Molfessis that the formation of a contract can occur from "acceptance by way of performance."  *See* Molfessis Report ¶ 15.  Acceptance by performance exists under French law only when the manifestation of will is certain and unequivocal.  It is difficult to show this type of acceptance.

17.     I note, however, the translation of Article 1113 of the French Civil Code—as modified by the Ordonnance 2016-131 and as interpreted in the last sentences of paragraph 15 of the Molfessis Report—is incomplete.  Article 1113 actually requires:

> The formation of a contract requires the meeting of an offer and an acceptance demonstrating the will of each of the parties to be bound.

> The demonstration of the will may be express, or may be implied from <u>an unequivocal</u> conduct.  (emphasis added).[7]

The adjective "unequivocal" ("*non équivoque*") is expressly stated in Article 1113,[8] thus further evidencing that not just any conduct is sufficient to prove acceptance—the conduct must be unambiguous and clear.

## IV.     PRINCIPLES OF FRENCH CONTRACT LAW

18.     The goal of contract interpretation under French law is to determine the common intent of the parties at the time of the contract.  Exhibit 4 (French Civil Code) at Article 1156 ("One must

---

[7] In French: "*Le contrat est formé par la rencontre d'une offre et d'une acceptation par lesquelles les parties manifestent leur volonté de s'engager.*

*Cette volonté peut résulter d'une déclaration ou d'un comportement non équivoque de son auteur.*"

[8] The translation in Exhibit 7 is also missing the adjective "unequivocal."  Exhibit 7 is available at: http://www.textes.justice.gouv.fr/art_pix/Draft-Ordonnance-for-the-Reform-of-the-Civil-Codepdf.pdf.

in agreements seek the common intention of the contracting parties, rather than stop at the literal meaning of the words.").[9]

19.     The French Civil Code sets out a number of guiding principles for determining the intent of the parties.  There is no definitive method for analyzing intentions, however, and the ultimate question of what a party intended is a question of fact to be solely determined by a competent Court applying the guiding principles.

20.     In the early nineteenth century, the *Cour de Cassation*[10] held that the interpretation of contracts was a legal question that can be reviewed de novo by appellate judges.  Accordingly, under French law the judge has ultimate authority to interpret contracts.  Where the contract (or a clause therein) is ambiguous, i.e., is unclear or imprecise, then the court should interpret the contract (or clause)—taking into consideration all relevant materials provided to the court.  On the other hand, if the contract (or clause) is not ambiguous, then the French court will give effect to the literal meaning that is apparent on the face of the contract (or clause) and conduct no further enquiry.  *See* Exhibit 8, Cass. Civ., 15 April 1872, Foucauld et Colombe, DP 1872.1.176 ("When the wording of a contract is clear and precise, it is forbidden to judges to distort its obligations and to modify its stipulations.").[11]

21.     Articles 1156-1164 ("Interpretation of agreements") of the French Civil Code provide guidelines for the French Courts to use in interpreting contracts and some of these provisions are

---

[9] In French: "*On doit dans les conventions rechercher quelle a été la commune intention des parties contractantes, plutôt que de s'arrêter au sens littéral des termes.*"

[10] The Court of Cassation is one of France's courts of last resort.

[11] In French: "*Il n'est pas permis aux juges, lorsque les termes d'une convention sont clairs et précis, de dénaturer les obligations qui en résultent et de modifier les stipulations qu'elle renferme.*"

7

relevant to understanding the ETSI IPR Policy.  Following a recent restatement of French

Contract Law (*Ordonnance 2016-131 du 10 février 2016*), this chapter of the French Civil Code

has been slightly modified and its articles renumbered.  They now read as articles 1188 to 1192.

I will hereafter use the old numbering unless otherwise provided.[12]

22.     Article 1156 provides that it is necessary to interpret the contract so as to determine "the

common intention of the contracting parties, rather than stop at the literal meaning of the words"

of the contract.  *See* Exhibit 4 at Article 1156.  This means that the mutual intention of the parties

to the contract is important to understanding the terms of the contract.

23.     If the intent of the parties is unclear, for example because there was not a common

understanding as to the disputed clause, then it is accepted that the judge should consider the

understanding of reasonable persons, of the same kind as the parties, and in the same

circumstances, regarding the disputed clause.  This principle is ubiquitous; it may be found, for

example, in many international instruments (e.g., Principles of International Commercial

Contracts (PICC); Vienna Convention on Contracts for the International Sale of Goods;

Principles of European Contract Law; etc.).[13]  It has now been expressly codified in the French

---

[12] The "Ordonnance" came in to force in October 2016.  In so far as it differs from the previous
state of contract law, it only applies to subsequent contracts.

[13] *See, e.g.*, PICC Article 4.1 of the Unidroit Principles (2004 version same as 1994 and 2010):
"*2) If such an intention cannot be established, the contract shall be interpreted according to the
meaning that reasonable persons of the same kind as the parties would give to it in the same
circumstances.*"

Vienna Convention on Contracts for the International Sale of Goods, 11 April 1980, Article 8(2):
"*Statements made by and other conduct of a party are to be interpreted according to the
understanding that a reasonable person of the same kind as the other party would have had in
the same circumstances.*"

Principles of European Contract Law, Article 5.101:
"*(1) A contract is to be interpreted according to the common intention of the parties even if this
differs from the literal meaning of the words.  (2) If it is established that one party intended the*

Civil Code following a recent restatement of law (*see* Ordonnance 2016-131 dated 10 February 2016) which added a second paragraph to article 1156 of the French Civil Code (renumbered article 1188).  Thus, this article currently provides:

> Art. 1188.  —  A contract is to be interpreted according to the common intention of the parties rather than according to the literal meaning of the terms which it uses.
>
> Where the common intention of the parties cannot be discerned, a contract is to be interpreted in the sense which a reasonable person placed in the same situation would give to it.

*See* Exhibit 7 at Article 1188.

24.    Article 1158 provides that when a phrase in a contract is susceptible of different meanings, it must be understood in the way that agrees best with the purpose of the contract.

*E.g.*, Exhibit 4 at Article 1158.

25.    Article 1159 further provides that when a phrase (or clause) in a contract is ambiguous, it shall be interpreted according to the custom in the location ("*pays*") where the contract was made.  *E.g.*, Exhibit 4 at Article 1159.  This reference to the local usage can be extended to the sociological context in which the contract was entered—which then is understood to refer to the custom in the industry.  *See, e. g.*, Exhibit 9, CA Orléans, 21 May 2002, Juris-Data 2000-187316.

26.    Article 1161 provides that clauses in a contract should not be interpreted in isolation, but instead the Court should consider how different clauses relate to each other so that the clauses each contribute to the goal or purpose of the agreement as a whole.  *E.g.*, Exhibit 4 at Article

---

*contract to have a particular meaning, and at the time of the conclusion of the contract the other party could not have been unaware of the first party's intention, the contract is to be interpreted in the way intended by the first party.  (3) If an intention cannot be established according to (1) or (2), the contract is to be interpreted according to the meaning that reasonable persons of the same kind as the parties would give to it in the same circumstances.*"

1161.  It follows that an ambiguous text must be understood to have the meaning that reconciles best with other relevant terms of the agreement.

27.      Finally, Article 1162 provides that "[i]n case of doubt, an agreement is interpreted against the party who has stipulated and in favor of the party who has contracted the obligation." Exhibit 4 at Article 1162.  In the current case, this rule works in favor of Huawei as it stands in this litigation as the purported debtor of the obligation to grant licenses in application of the ETSI rules.

V.      APPLICATION OF FRENCH CONTRACT LAW PRINCIPLES TO THE ETSI IPR POLICY

A.      Interpretation of ETSI IPR Policy Section 4.1 as to "Timely" Disclosure

28.      In paragraphs 35-38, the Molfessis Report addresses Sections 4.1 and 4.2 of the ETSI IPR Policy.  I disagree with Professor Molfessis' analysis of those provisions as well as with his conclusion that "timely" disclosure requires disclosure before a proposal is adopted.

29.      ETSI members from around the world participate in ETSI's standard setting activities. ETSI needed to select a jurisdiction whose laws would apply to their activities.  ETSI and its members decided that French law should govern their conduct under the ETSI IPR Policy. Clause 12 expressly provides that "[t]he POLICY shall be governed by the laws of France." Exhibit 10 (1997 IPR Policy, TMOBILE_00301602) at Clause 12; Exhibit 11 (2009 IPR Policy, TMOBILE_00300796) at Clause 12; Exhibit 12 (2016 IPR Policy, TMOBILE_00301505) at Clause 12.

30.      Principles of interpretation from French contract law are used to decipher the meaning of "timely" disclosure because this term is ambiguous on its own.  The IPR Policy does not define a time limit for "timely" disclosure.  The ETSI Guide on IPRs also makes clear that there is no common intention of the contracting parties to define the term "timely" because "[d]efinitions

10

for 'Timeliness' or 'Timely' cannot be agreed." *See* Exhibit 13 (2008 ETSI Guide on IPRs, TMOBILE_00300778) at Section 2, Note 1; Exhibit 14 (2013 ETSI Guide on IPRs, TMOBILE_00301483) at Section 2, Note 1. As a result, because the term is not clear on its face, it requires the court to apply the principles of French contract law interpretation. *See, e.g.*, Exhibit 4 (French Civil Code) at Article 1156 (requiring that the court must seek the common intention of the contracting parties, rather than stop at the literal meaning of the words).

31.     I disagree with the opinion in the Molfessis Report that: "a court applying French law would interpret the IPR policy as requiring that the member disclose the IPRs ***before*** the proposal is adopted." Indeed, it is not proper for Professor Molfessis to offer this opinion because it is the court's province to interpret the bounds of "timely" disclosure. Moreover, the opinion in the Molfessis Report is unsupported.

32.     The correct starting point for the analysis is with the language of Section 4.1 and 4.2 of the ETSI IPR Policy. As explained above, a French Court interpreting this provision would attempt to ascertain the intention of the parties, either actual or reasonable. First, I note that Section 4.1 states that the ETSI MEMBER shall use its "reasonable endeavours" to "timely inform" ETSI of ESSENTIAL IPRs. Exhibit 10 at Clause 4.1; *see also* Exhibit 11 at Clause 4.1; Exhibit 12 at Clause 4.1. This language does not indicate an intent to place a strict time limit on when disclosure must be made, but instead indicates that the contracting parties intended only that reasonable efforts be made for disclosure. Indeed, Section 4.2 plainly states that the obligations pursuant to Clause 4.1 do not imply any obligation on MEMBERS to conduct IPR searches, either before a proposal is adopted or after. Exhibit 10 at Clause 4.2; *see also* Exhibit 11 at Clause 4.2; Exhibit 12 at Clause 4.2.

33.     I further note Professor Molfessis' citation to a United States District Court case, *Apple v.
Motorola Mobility*.  I have read that decision and, while the decision makes reference to French
law earlier in the opinion, I see no indication that the District Court in the Apple case applied the
principles of French contract interpretation to the language of Section 4.1.  Moreover, it is my
opinion that the decision in the Apple case draws an incorrect conclusion from the language of
Section 4.1.  The court appears to conclude that because the Section makes reference to
disclosure "if" a proposal is adopted, disclosure must occur prior to adoption of the proposal.  In
my opinion, the court in Apple has mistakenly created a bright line rule from language which
does not indicate that the parties to the ETSI IPR Policy intended to do so.

34.     First, the plain text of Section 4.1 requires disclosure from the ETSI MEMBER making
the proposal "on a bona fide basis."  Exhibit 10 at Clause 4.1; *see also* Exhibit 11 at Clause 4.1;
Exhibit 12 at Clause 4.1.  In my view, this means that disclosure is only required where and
when the ETSI MEMBER knows or should know that he owns IPRs essential to his proposal.
Under French law, "bona fide" is also understood as a duty to act in "good faith," and it applies
equally to the FRAND undertaking.  This second aspect of the concept of "bona fide" makes
sense in the current context.  "The Policy is intended to ensure that IPRs are identified in
sufficient time to avoid wasting effort on the elaboration of a Deliverable which could
subsequently be blocked by an Essential IPR."  *See* Exhibit 13 at Section 1.1; Exhibit 14 at
Section 1.1.  Thus, where the ETSI MEMBER is genuinely willing to make a FRAND
undertaking, the timing of the IPR disclosure has little importance because of the superseding
good faith commitment to license the IPR on FRAND terms.

35.     Second, the interpretation of the Molfessis Report (and the Apple court) incorrectly reads
Section 4.1 in a way that is inconsistent with Section 3 of the ETSI IPR Policy which is titled

"Policy Objectives."  French Civil Code Article 1161 requires that the contract be read as a whole and that individual words not be read in isolation so as to give greater weight to individual words against the overall intent and purpose of the contract.  *See* Exhibit 4 at Article 1161. Section 3.1 provides that standards are to be adopted "which best meet the technical objectives of the European telecommunications sector"—that is, standards are adopted based on their technical merit.  *See* Exhibit 10 at Clause 3.1; *see also* Exhibit 11 at Clause 3.1; Exhibit 12 at Clause 3.1. There is no indication that ETSI has a goal of adopting technical standards which are free of IPR rights.  This is made clear in Section 3.1, which then goes on to state that the goal of disclosure is to make sure that "investment in the preparation, adoption and application" of standards is not "wasted as a result of an ESSENTIAL IPR for a STANDARD being *unavailable*."  *See* Exhibit 10 at Clause 3.1; *see also* Exhibit 13 at Section 1.1 ("The Policy is intended to ensure that IPRs are identified in sufficient time to avoid wasting effort on the elaboration of a Deliverable which could subsequently be blocked by an Essential IPR.").  In other words, the concern and intent of the parties in creating the ETSI IPR Policy was to address the risk not of late disclosure, but of adoption of a standard where the IPR holder refuses to make a FRAND commitment at all. Thus, "timely" disclosure only seeks to avoid the adoption of a technical standard that is unavailable because the IPR holder refuses to license on FRAND terms.  Accordingly, it can be inferred that ETSI is not concerned with the timing of the disclosure when the IPR holder agrees to license on FRAND terms.

36.     Third, a member's duty to declare its Essential IPRs continues even after a standard is adopted.  Section 4.6.3.4 of the ETSI Guide on IPRs explains that Clause 4.1 of the ETSI IPR Policy "does not mean either that the window of opportunity for a member to declare its Essential IPRs is closed once a standard is adopted or that the member's duty to use its

'reasonable endeavours' post-adoption is waived or altered." Exhibit 13 at Section 4.6.3.4; Exhibit 14 at Section 4.6.3.4. It is thus clear to me that post-adoption disclosure can still be "timely."

37.     My interpretation of the intent of the parties to the ETSI IPR Policy is further reinforced by Section 8, entitled Non-availability of Licenses. Section 8 provides that when an IPR holder refuses to provide a declaration indicating it will license on FRAND terms, then ETSI seeks a "viable alternative technology" that "is not blocked by that IPR." *See* Exhibit 10 at Clause 8.1.1; *see also* Exhibit 11 at Clause 8.1.1; Exhibit 12 at Clause 8.1.1. This confirms that the intent of the parties to the ETSI IPR Policy was to ensure that licenses to essential IPRs are available, not on disclosure for its own sake. If the interpretation of the Molfessis Report were correct, then one would expect the ETSI IPR Policy to include a provision addressing the consideration of "viable alternative technology" even when the IPR holder has disclosed that it will agree to grant FRAND licenses. There is no such provision.

38.     In accordance with Article 1158 of the French Civil Code, I also considered the "ETSI Guide on IPRs" which includes a section which discusses the "main problems" which can arise from "late disclosures." Exhibit 13 at Section 2; Exhibit 14 at Section 2. Specifically, the ETSI Guide on IPRs identifies two such problems:

> Licenses for Patents which have been disclosed late and are not available at all, or,
>
> Licenses for Patents which have been disclosed late and which are available, but not on Fair, Reasonable and Non-Discriminatory (FRAND) terms, i.e. the company is unwilling to make a "FRAND" undertaking/licensing declaration.

Exhibit 13 at Section 2; Exhibit 14 at Section 2.

39.     Again, I note that the ETSI Guide is not concerned with potentially late disclosures in which the IPR holder has agreed to make "Licenses for Patents" available on FRAND terms.

Instead, "late disclosure" was understood by the parties to the ETSI Policy as relating to the late disclosure of a refusal to license, including a refusal to license on FRAND terms, only.

40.     In accordance with Article 1159 of the French Civil Code, a French Court attempting to interpret what constitutes "timely" disclosure would also be guided by evidence concerning the past and current practices of ETSI members.  I note that the *Cour de Cassation* stated: "in order to determine the common intent of the parties, it is not forbidden to take into account their subsequent behavior."[14]  *See* Exhibit 15, Civ. 1, 13 December 1988, n°86-19.068, *Bull. I*, n°352, p. 239; *see also* Exhibit 16, Civ. 1, 9 November 1993, n°91-22.059, *Bull. I*, n°317, p. 220; Exhibit 17, Civ. 3, 15 November 1972, n°71-12.517, *Bull. III*, n°616, p. 453; Exhibit 18, Civ. 3, 8 April 2014, n°13-16.022.

41.     Moreover, the court tasked with performing the interpretation may use any means to determine the intentions of the contracting parties.  *See* Exhibit 19 (*Les obligations*) at  n°450, p. 499; Exhibit 20 (*Les obligations*, *L'acte juridique*) at n°395, p. 414.  The *Cour de Cassation* has also explained that "testimonial proof may be used to interpret an obscure or ambiguous contract."  *See* Exhibit 21, Civ. 1, 26 January 2012, n°10-28356, *Bull. I*, n°13; *see also* Exhibit 22, Civ. 3, 14 November 1973, n°72-10.738, *Bull. III*, n°582, p. 424; Exhibit 23, Civ. 1, 3 March 1969, *Bull. I*, n°94.

42.     The Molfessis Report, however, does not discuss the custom in the industry.  This is problematic because evidence concerning the timing of the majority of IPR disclosures in

---

[14] In French:  "*Pour déterminer quelle a été la commune intention des parties à un acte il n'est pas interdit aux juges du fond de relever le comportement ultérieur des contractants.*"

relation to the publication of a relevant technical specification is pertinent to a French court's interpretation of "timely" as reflected in the ETSI members' customary practice.

43.     In addition, I find the interpretation of timely disclosure in the Molfessis Report to be doubtful under French Civil Code Articles 1156, 1158, 1159, and 1161 for an additional reason. Professor Molfessis advocates a bright line rule requiring disclosure prior to adoption.  But, the formal "Note 2" in the ETSI Policy Guide states:

> "Intentional Delay" has arisen when it can be demonstrated that an ETSI member has deliberately withheld IPR disclosures significantly beyond what would be expected from normal considerations of "Timeliness."

Exhibit 13 at Section 2; Exhibit 14 at Section 2.

44.     If the parties to the ETSI IPR Policy had indeed Professor Molfessis' bright line rule, then there would be no need for the ETSI Policy Guide to address additionally the concept of "intentional delay" and to state that intentional delay arises when the ETSI member has "deliberately withheld" the disclosure "significantly beyond what would be expected from normal considerations of 'Timeliness.'"  *See* Exhibit 13 at Section 2; Exhibit 14 at Section 2.  In other words, "late disclosure" cannot be found merely from the fact that a disclosure occurred after adoption of the standard.  Instead, non-timely disclosure is something that according to the ETSI Policy Guide requires both intent and a departure from "normal considerations" of what is timely.  I read this language, consistent with the French Civil Code, as making industry custom and practice regarding normal considerations of timeliness highly relevant to understanding the intent of the parties regarding timely disclosure.

> B.     Interpretation of ETSI IPR Policy as to Portfolio vs Patent-by-Patent License Offers

45.     The Molfessis Report devotes only a single paragraph to this issue.  In my opinion, the Molfessis Report incorrectly takes isolated phrases (e.g., "such IPR") and gives them excessive

16

weight, and thus fails to follow the requirements of the French Civil Code Articles 1156, 1158, and 1161 which require reading a contract as a whole and looking to the overall contract to assess the intent of the parties.  The Molfessis Report makes the same error when it asserts that the word "an" before "Essential IPR" must refer to an individual patent.  As described in more detail below, a French court would not interpret "*an* ESSENTIAL IPR" to be limited to only a single patent—rather, it is my opinion that the phrase can refer to more than one patent (e.g., a patent portfolio).

46.     First, French law recognizes the concept that a bundle of products can be considered as one object; this is called the doctrine of *universalité*.  Therefore, it is possible that all the declared patents from a single Member cannot be divided during the licensing process.  In such a case, pursuant to the doctrine of *universalité*, Professor Molfessis is wrong that the ETSI policy must be limited to a patent-by-patent licensing process.

47.     Second, Professor Molfessis does not discuss the nature of the FRAND commitment, which relates to the price for a patent license to essential IPRs.  Applying the FRAND concept, it is certainly fair, reasonable, and non-discriminatory to license together a portfolio of essential patents, for a FRAND price.

48.     In this respect, I note that the goal of the ETSI IPR Policy is to establish "a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of *IPRs*."  Exhibit 10 (ETSI IPR Policy) at Clause 3.1 (emphasis added); Exhibit 11 at Clause 3.1; Exhibit 12 at Clause 3.1; *see also* Exhibit 13 (ETSI Guide) at Section 1.1; Exhibit 14 at Section 1.1.  The plural form ("IPRs") reflects that this balance should be achieved on a wider scale than the patent-by-patent approach supported by Professor Molfessis.  Consistently, Section 3.2 of the ETSI IPR Policy discusses the goal of adequately rewarding

17

those who develop technology and specifically states that IPR holders "should be adequately and fairly rewarded for the use *of their IPRs* in the implementation of Standards [and Technical Specifications]." Exhibit 10 at Clause 3.2 (emphasis added); Exhibit 11 at Clause 3.2; Exhibit 12 at Clause 3.2. Once again, this plural form ("IPRs") suggests that the ETSI IPR Policy both contemplates that members would have multiple IPRs and that they would need to be compensated adequately for the use of their portfolio of essential IPRs in the standardization process. This is further evidence that the intent of the ETSI IPR Policy is not just focused on compensation for individual patent disclosures, but rather on compensation of IPR rights holders for "the bundle" of IPRs that they own.

49.     In my view, the ETSI Policy Objectives in Section 3 of the ETSI IPR Policy show that the intention of ETSI was to achieve the desired "balance" described in Section 3.1 by ensuring that owners of IPR portfolios are "adequately and fairly rewarded for the use of their IPRs in the implementation of STANDARDS," as described in Section 3.2. The owner of an IPR portfolio is requested by ETSI to give an undertaking that it is prepared to grant licences on fair, reasonable and non-discriminatory terms and conditions under such IPRs. *See* Exhibit 10 at Clause 6.1; Exhibit 11 at Clause 6.1; Exhibit 12 at Clause 6.1. There is thus a symmetry between the *fair* reward to be received for the IPR portfolio and the *fair* terms under which a license should be granted. For those who implement standards, it is therefore understood that ETSI's intention is that those entities who are making use of an IPR portfolio will adequately and fairly reward the owner of those IPRs by agreeing to license on FRAND terms.

50.     Further, Section 6.2 of the ETSI IPR Policy (Annex 6, as of 26 November 2008) itself compels a conclusion opposite that of Professor Molfessis. Under Section 6.2, a declaration as to a single member of a patent family applies to "all existing and future Essential IPRs" of that

patent family.  *See* Exhibit 11 at Clause 6.2; Exhibit 12 at Clause 6.2.  This indicates that the

singular form used in Section 6.1 ("an essential IPR") actually refers to "one or more" IPRs,

showing that a single declaration to license can affect an owner's obligations for more than a

single patent.  In the same vein, Section 4.3 of the ETSI IPR Policy makes clear that an IPR

holder need not even make a disclosure or declaration regarding other members (even future

members) of a patent family.  Exhibit 11 at Clause 4.3; Exhibit 12 at Clause 4.3.  Disclosure of

any member in the family is deemed to cover the entire collection of patents in the Patent Family

for disclosure purposes.

51.     Additionally, I note that contrary to the Molfessis Report, the ETSI Policy Guide

specifies that the discussion of licensing terms is a private matter between the licensor and

potential licensee.  For example, at Section 2.2 the ETSI Guide states:  "Members do NOT have

a duty to: disclose within the Technical Body the commercial terms for licenses for which they

have undertaken to grant licenses under FRAND terms and conditions.  Any such commercial

terms are a matter for discussion between the IPR holder and the potential licensee, outside of

ETSI (see section 4.1 of this Guide)."  Exhibit 13 at Section 2.2; Exhibit 14 at Section 2.2.  In

other words, it is for the parties—and not ETSI—to negotiate FRAND terms for the patent

license.

52.     Lastly, the Molfessis Report ignores the relevant industry custom, and thus fails to follow

the requirements of the French Civil Code Article 1159 which requires interpreting what is

ambiguous according to the custom in the industry where the contract was made.  *See* Exhibit 4

at Article 1159.  I read the ETSI IPR Policy and Guide, consistent with the French Civil Code, as

making industry custom and practice regarding portfolio licensing highly relevant to

understanding the intent of the parties.  In particular, by expressly declining to address it within

19

ETSI, the Guide leaves the IPR Policy ambiguous and the interpretation shall be guided by Article 1159.

      C.      <u>Are Third Parties Beneficiaries of an ETSI Member's Obligation to "Inform ETSI of ESSENTIAL IPRs in a Timely Fashion?"</u>

53.      At paragraphs 40-45, Professor Molfessis opines that ETSI is not the sole beneficiary of disclosures by its members of essential IPR.  I disagree with this opinion as it relates to the obligation to "timely" disclose.

54.      I agree with Professor Molfessis that ETSI is not the intended beneficiary of FRAND patent licenses.  However, ETSI is the intended beneficiary of the obligation to disclose "timely" IPRs.  Therefore, only ETSI should be able to challenge a late disclosure.

55.      Professor Molfessis suggests that the doctrine of *stipulation pour autrui* would give all ETSI members and third parties a right to complain when any ETSI member fails to disclose essential IPR.  Molfessis Report ¶ 43 ("An association like ETSI may be the forum for a *stipulation pour autrui*.").  I disagree.  Under French law, a *stipulation pour autrui* applies only when the contracting parties intend for a third party to receive a particular benefit, and it gives a third party a contractual right only with respect to that particular benefit.  Notably, it does not give a third party any contractual right with respect to other duties, obligations, or benefits under the contract.  Although a FRAND undertaking benefits third parties, the language of the IPR Policy shows that the benefit of the disclosure obligation is owed only to ETSI, and *not* to other members or third parties for at least the following three reasons.

56.      First, the IPR Policy says that the disclosure requirement is to ETSI.  Clause 4.1 states that members shall "timely inform *ETSI* of" and "draw the attention of *ETSI* to" essential IPRs. Exhibit 10 (ETSI IPR Policy) at Clause 4.1 (emphasis added); *id.* at Section 14 ("Any violation of the POLICY by a MEMBER shall be deemed to be a breach, by that MEMBER, of its

*obligations to ETSI*." (emphasis added)); *see also* Exhibit 11 at Clauses 4.1, 14; Exhibit 12 at

Clauses 4.1, 14.  Thus, the burden of disclosure is owed to ETSI itself, not other members or

third parties.  Clause 4.1 makes no mention of an obligation to disclose essential IPRs to other

members or third parties.

57.     Second, ETSI is the only party who receives a benefit from the disclosure under the IPR

Policy.  Clause 6.1 provides that "[w]hen an ESSENTIAL IPR . . . is brought to the attention of

ETSI, the Director-General of ETSI shall immediately request [a declaration stating the owner's

intention.]"  Exhibit 10 at Clause 6.1; *see also* Exhibit 11 at Clause 3.1; Exhibit 12 at Clause 3.1.

Thus, the beneficiary of the disclosure obligation is ETSI which, having the benefit of disclosure,

may then seek a FRAND commitment.  According to the IPR Policy, disclosure is not intended

to benefit any other party under the contract.

58.     Third, ETSI and its members did not intend for other members or third parties to be

beneficiaries of the IPR Policy's disclosure requirements.  For example, the IPR Policy does not

provide third parties or individual members any recourse for violations of the disclosure

requirement.  Rather, ETSI and its members intended for the ETSI General Assembly to

determine when a breach has occurred and what the appropriate remedy should be.  This is

discussed further in the next sub-section of my report.

59.     Professor Molfessis appears to agree that the disclosure requirements themselves are

written to provide a direct benefit to ETSI, and not to others such as third parties.  Professor

Molfessis, however, opines that third parties receive two *indirect* benefits from the disclosure

requirements: "Other parties implementing the standards are beneficiaries of such a disclosure

because the ETSI member must either grant irrevocable licenses on fair, reasonable and non-

discriminatory terms and conditions (Clause 6.1) or, if it chooses not to, ETSI may determine

whether a viable alternative technology exists (Clause 8.1.1)."  Molfessis Report ¶ 43.  I disagree with Professor Molfessis on both points.

60.     The IPR Policy does not guarantee a right to "irrevocable licenses on [FRAND] terms and conditions."  Regardless of whether members disclose IPRs, IPR holders may refuse to license their essential IPR.  *See* Exhibit 10 at Clauses 6.1, 8.1.1, 8.1.2; *see also* Exhibit 11 at Clauses 6.1, 8.1.1, 8.1.2; Exhibit 12 at Clauses 6.1, 8.1.1, 8.1.2.  The ETSI Guide on IPRs further reinforces this fact.  It expressly states that members may refuse to license their IPR: "Members are fully entitled to hold and benefit from any IPRs which they may own, *including the right to refuse the granting of licenses*."  Exhibit 13 at Section 1.1 (emphasis added); *see also* Exhibit 14 at Section 1.1.  Additional support can also be found in the French "freedom to contract principle," which provides that no one can be a party to a contract if he does not so intend.  Accordingly, as a matter of pure French contract law, each ETSI member is free to develop its own position regarding the licensing of its essential IPRs.  Any attempt to impose an obligation to license essential IPR would be incorrect under French law.

61.     I also disagree with Professor Molfessis' opinion that third parties may always complain on the basis of a tortious liability for loss suffered from breach of contract "without the need to show an independent tort."  Molfessis Report ¶ 44.  Since 2008, the *Cour de Cassation* has maintained the opposite holding.  Specifically, the *Cour de Cassation* held that "the court of appeal should have verified that the contractual breach could also stand as a tortuous fault."[15] *See* Exhibit 24, Civ. 3, 22 October 2008, n°07-15.583 and 07-15.692, *Bull. III*, n°160; *see also* Exhibit 25, Civ. 1, 15 December 2011, n°10-17.691; Exhibit 26, Com. 18 January 2017, n°14-

---

[15] In French: "*En statuant ainsi, sans rechercher si le manquement contractuel qu'elle relevait constituait uen faute quasi-délictuelle, la Cour d'appel n'a pas donné de base légale à sa decision.*"

16.442.  This holding was affirmed in a recent decision.  *See* Exhibit 27, Civ. 3, 18 May 2017, n°16-11.203, FS-PBRI.

        D.      <u>Remedies for Breach of ETSI Obligations</u>

62.      In paragraphs 46-48, the Molfessis Report addresses Section 14 of the ETSI IPR Policy. I disagree with Professor Molfessis' analysis of this provision as well as with his conclusion that third parties can obtain relief for a violation of the ETSI IPR Policy by an ETSI member.

63.      I start first with the language of Section 14 of the ETSI IPR Policy, which is unambiguous as to the intention of the parties to give the authority to the *ETSI General Assembly* to decide the action to be taken, if any, against a member in breach.  Exhibit 10 at Clause 14; *see also* Exhibit 11 at Clause 14; Exhibit 12 at Clause 14.  The formal "Note 3" in the ETSI Policy Guide further clarifies that "'Intentional Delay,' where proven, . . . can be sanctioned by the *General Assembly*."  Exhibit 13 at Section 2, Note 3; Exhibit 14 at Section 2, Note 3.  Together, there is no doubt that the common intention of the contracting parties was to assign authority to the ETSI General Assembly for reviewing alleged violations of the IPR Policy related to "timely" disclosure.  Accordingly, the remedies would take place within ETSI.  To the extent that the Molfessis Report suggests that this authority is also granted to third parties, I disagree. *See, e.g.*, Exhibit 4 (French Civil Code) at Article 1156 (interpretation is guided by "the common intention of the contracting parties").

64.      I also note Professor Molfessis' reliance on a quotation from "one scholar," theorizing that a member failing to adhere to the bylaw shall incur "contractual liability" and potentially "a disciplinary sanction."  Molfessis Report ¶ 48.  However, I see no indication that these remedies would be available to a third party to the ETSI IPR Policy, nor does it appear plausible to me that

23

the common intention of the contracting parties to the ETSI IPR Policy was to grant such authority to the General Assembly *and* third parties alike.

65.     In paragraph 49, the Molfessis Report appears to concede that the contractual language of the IPR Policy does not actually bestow any authority onto third parties.  Moreover, asserting "general ordinary law" as a workaround would violate the French Civil Code, Article 1162.

66.     Lastly, it is unclear what damages are suffered by a third party for a violation of the "timely" disclosure requirement where, as discussed above, the IPR holder has agreed to make "Licenses for Patents" available on FRAND terms.

24