**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| HUAWEI TECHNOLOGIES CO. LTD | § | |
| | § | |
| v. | § | Case No. 2:16-CV-00055-JRG-RSP |
| | § | |
| T-MOBILE US, INC., T-MOBILE USA, | § | |
| INC. | § | |

## REPORT AND RECOMMENDATION

This Report and Recommendation addresses the pending motions for summary judgment. *See* Dkts. 245, 248, 249, 250, 252, and 253. For the reasons explained below, with the exception of T-Mobile and Intervenors' motion for summary judgment of no presuit damages, Dkt. 245, the motions for summary judgment should be denied. The Court does, however, recommend limited partial relief under Rule 56(g) in the context of T-Mobile and Nokia's motion for summary judgment of noninfringement of the '575 patent, Dkt. 248, and T-Mobile and Intervenors' motion for summary judgment of invalidity of claim 1 of the '675 patent, Dkt. 253.

## BACKGROUND

On January 15, 2016, Plaintiff Huawei Technologies Co. Ltd. ("Huawei") filed four lawsuits against Defendants T-Mobile USA, Inc. and T-Mobile US, Inc. (collectively, "T-Mobile"), alleging infringement of fourteen patents that Huawei contends are essential to the Long-Term Evolution (LTE) standard for wireless communication. *See* Case Nos. 2:16-cv-52, -55, -56, -and 57. After claim construction, Huawei dropped two of the asserted patents, leaving twelve, and because of the Court's summary judgment and other rulings in Case No. 2:16-cv-52 (now consolidated with 2:16-cv-56), additional patents are no longer asserted. As far as the Court can tell, Huawei is currently asserting ten patents across the four cases. The patents-in-suit relate to features and components of the LTE network, and this case involves four of the patents: U.S.

Patent Nos. 8,325,675 ("the '675 patent"), 8,531,971 ("the '971 patent"), and 8,798,575 ("the '575 patent"), 8,908,627 ("the '627 patent"). *See* Case No. 2:16-cv-55, Compl., Dkt. 1.

Huawei's lawsuits prompted intervention by Nokia Solutions and Networks US LLC, Nokia Solutions and Networks Oy (collectively, "Nokia"), Ericsson, and Ericsson, Inc. (collectively, "Ericsson"). Nokia filed counterclaims, asserting patent infringement by Huawei, prompting the Court to sever these counterclaims into four additional cases. *See* Case Nos. 2:16-cv-753, -54, -55, and -56. In total, there are nine cases pending related to patent infringement.

After filing the first four lawsuits, Huawei filed a fifth lawsuit seeking a declaratory judgment that Huawei's portfolio-wide standard essential patent (SEP) license offer to T-Mobile was fair, reasonable, and nondiscriminatory (FRAND). *See* Case No. 2:16-cv-715. Huawei's ultimate goal—through not only this lawsuit but also through the patent infringement lawsuits—appears to be a determination of a FRAND rate for a license to its relevant cellular network portfolio. *See id.*, Dkt. 24 (motion for special FRAND-related case management conference). T-Mobile has refused to take a portfolio-wide license on a number of grounds, and thus Huawei has decided to proceed patent-by-patent through its portfolio. The asserted patents, as Huawei describes them, are only "exemplary patents selected from Huawei's 4G Wireless Network Essential Patents." *See id.* Compl. ¶ 4, Dkt. 1. The nine cases have nevertheless amassed nearly 2,000 docket entries.

Trial in this case, which will be the first trial in the dispute, is currently scheduled to begin November 13, 2017, before Judge Gilstrap. T-Mobile and Intervenors have moved for summary judgment and partial summary judgment on a number of grounds—the lack of presuit damages, noninfringement, invalidity, and exhaustion of rights. All of T-Mobile and Intervenors' motions for summary judgment are addressed in this Report and Recommendation.

## DISCUSSION

Summary judgment must be granted when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 899, 902 (5th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must consider evidence in the record in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Thorson v. Epps*, 701 F.3d 444, 445 (5th Cir. 2012). The moving party must identify the portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once a party has made that showing, the non-moving party bears the burden of establishing otherwise. *Geiserman v. MacDonald*, 893 F.2d 787, 793 (5th Cir. 1990) (citing *Celotex*, 477 U.S. at 323). The non-moving party cannot "rest upon mere allegations or denials" in the pleadings, but "must set forth specific facts showing there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 248. Thus, summary judgment "is appropriate if the non-movant 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" *Bluebonnet Hotel Ventures, LLC v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014) (quoting *Celotex*, 477 U.S. at 322).

### 1.  T-Mobile's Motion for Summary Judgment of No Presuit Damages, Dkt. 245

T-Mobile moves for summary judgment that Huawei is not entitled to presuit damages because Huawei sold products embodied by the patents-in-suit but failed to mark those products as required for constructive notice under 35 U.S.C. § 287(a). Dkt. 245. The parties' dispute is a narrow one: Huawei opposes the motion only because Huawei contends that the marking statute does not apply when a party is currently asserting only method claims, or alternatively that the statute does not limit presuit damages because it applies on a claim-by-claim basis. The Court has

already rejected the latter argument. *Huawei Techs. Co. v. T-Mobile US, Inc.*, No. 2:16-cv-00052-JRG-RSP, 2017 WL 4183103, at \*2-\*3 (E.D. Tex. Sept. 4, 2017), *report and recommendation adopted*, No. 2:16-cv-00052-JRG-RSP, 2017 WL 4251365 (E.D. Tex. Sept. 20, 2017).

The former argument is complicated only by an apparent conflict in Federal Circuit cases addressing the marking statute. As the Court previously explained, the Federal Circuit appears to have drawn a distinction between cases in which a patent holder has asserted only method claims of a patent containing both method and apparatus claims and cases in which the patent holder has asserted both types of claims, with only the latter instance being subject to the marking statute. *See id.* at \*2. The Court would ordinarily be obligated to follow the earlier panel decision, which clearly states that "[w]here the patent contains both apparatus and method claims . . . to the extent that there is a tangible item to mark by which notice of the asserted method claims can be given, a party is obliged to do so if it intends to avail itself of the constructive notice provisions of section 287(a)." *Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1538-39 (Fed. Cir. 1993); *see also ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1334 (Fed. Cir. 2012). Under the rule of *American Medical*, which in the Court's view is consistent with the text and purpose of § 287(a), Huawei is unquestionably precluded from recovering presuit damages.

Even the later cases that have attempted to limit *American Medical*, however, foreclose Huawei's position. The distinction drawn by the panel in *Crown Packaging Technology, Inc. v. Rexam Beverage Can Co.*, for example, suggests that if a patent holder has "only asserted method claims despite the fact that the patent contained both method and apparatus claims," the marking statute does not limit presuit damages. *See* 559 F.3d 1308, 1317 (Fed. Cir. 2009). In this case, by contrast, the patents-in-suit all contain both method and system claims, and Huawei has asserted that T-Mobile infringes at least one system claim from each patent-in-suit. *See* Compl. ¶¶ 42, 64,

4

and 75, Dkt. 1. Thus, Huawei is not insulated by *Crown Packaging*, which at most only restricts application of the marking statute in instances where a patent holder never asserted apparatus claims. *See* 559 F.3d at 1317.

Huawei's argument that the inquiry turns on which claims are currently being actively asserted in the litigation is not persuasive. It is difficult to see the basis for a distinction between method and apparatus claims in the marking statute. To further conclude that application of the statute turns on a patent holder's decision to drop apparatus claims at some point during litigation defies logic. As other district courts have found, "[a]pparatus claims were asserted, so the marking requirement is not excused." *Unwired Planet, LLC v. Apple Inc.*, No. 13-cv-04134-VC, 2017 WL 1175379, at *4 (N.D. Cal. Feb. 14, 2017); *see also Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 906 F. Supp. 2d 399, 407 (W.D. Pa. 2012); *Mformation Techs., Inc. v. Research in Motion Ltd.*, 830 F. Supp. 2d 815, 838 (N.D. Cal. 2011). T-Mobile's motion for summary judgment that Huawei is not entitled to presuit damages should therefore be granted.

## 2.  T-Mobile and Intervenors' Motion for Partial Summary Judgment of Noninfringement of the '575 Patent, Dkt. 248

Defendants and Intervenors move for partial summary judgment that claims 1-3 of the '575 patent are not infringed by T-Mobile's use of one of the two accused charging systems.[1] Dkt. 248. Although the question is a close one, because an email produced by T-Mobile could give rise to a reasonable inference that the relevant claim limitation is met, the motion should be denied. The Court does, however, find it appropriate to grant partial relief under Rule 56(g) as discussed below.

The asserted claims of the '575 patent relate generally to methods of charging and billing cellular network customers for data usage. Claim 1 of the '575 patent recites:

---

[1] To avoid reference to information designated by the parties as confidential, the Court will refer to the charging system at issue in this motion as the "first accused charging system." The other charging system, not at issue in this motion, is referred to as the "second accused charging system."

> A method for improving service data flow based charging in a communications network, comprising:
>
> a Charging Rules Function (CRF) determining a charging method and charging rules in response to a service in response to a service request or other trigger event, and
>
> the CRF providing a Traffic Plane Function (TPF) with the charging rules and address information of a charging system.

Claim 2 recites that the charging system is "an Online Charging System (OCS)." Claim 3 further recites that the TPF requests credit information from the OCS, and the OCS provides the credit information to the TPF.

Three elements of the claims are relevant to T-Mobile and Intervenors' motion for partial summary judgment: the CRF, the TPF, and the charging system. The second element of claim 1 requires that the CRF send "address information of a charging system" to the TPF. T-Mobile and Intervenors contend that there is no evidence in the record that would allow a reasonable jury to conclude that the accused CRF sends address information of the first accused charging system to the TPF. *See* Dkt. 248. Rather, T-Mobile and Intervenors argue that when the first accused charging system is used in the T-Mobile network, the TPF is preconfigured with the address information of the first charging system, and the CRF never sends this information to the TPF. *See, e.g.*, *id.* at 2.

Huawei points to two items of evidence in opposing summary judgment. The first is the report and deposition testimony of Dr. Raymond Leopold. *See* Dkt. 260 at 1. Dr. Leopold explains that when the first accused charging system is used, the CRF sends "default address information" to the TPF. *See id.* By contrast, when the second accused charging system is used, the CRF sends "individualized address information" to the TPF. *See id.*

The "default address information," however, is no address information at all. What Dr. Leopold is really saying is that because the TPF *has* address information information of the

first accused charging system, the claim limitation is necessarily met. Dr. Leopold explained during his deposition that "if you send a bit of [address] information, it's the [second accused charging system]; *if you don't send it*, by default it's the [first accused charging system]." Leopold Dep. at 103:12-24, Dkt. 260-2 (emphasis added). As Dr. Leopold admits, the address of the first accused charging system is "preprogrammed," or in other words, "[i]t's the default." Leopold Dep. at 111:15-19, Dkt. 248-7.

Thus, the accused CRF, according to Dr. Leopold, does one of two things. The CRF either directs the TPF to the second accused charging system, or it sends the TPF a "default" message, indicating that it is *not* directing the TPF to the second accused charging system. *See id.* at 100:20-101:19. By doing so, the TPF knows to use the first accused charging system. But critically, the CRF does not send the TPF "address information" of the first accused charging system. Rather, the TPF already has this information. *See id.*

The Court evaluated this very issue during claim construction. The scenario Dr. Leopold describes is recited in dependent claims 5 and 11, which require the "address information" to be "empty" or "not provided." *See* Dkt. 210 at 57. These claims, the Court concluded, are indefinite for failure to comply 35 U.S.C § 112, ¶ 4, inasmuch as the claims directly contradict the claim from which they depend (claim 1), which requires the CRF to provide the TPF with address information of the charging system. *See id.*

Dr. Leopold's opinion regarding the CRF providing a "default" indication cannot create a dispute of material fact regarding whether the CRF sends the TPF address information of the first accused charging system. Dr. Leopold's conclusion is foreclosed by the claim limitation, which requires that "address information" be sent to the TPF from the CRF. It is nonsensical to conclude that no address information at all can be considered "address information." Accordingly, pursuant

to Rule 56(g), the Court should enter an order stating that the CRF does not send "address information" of the first accused charging system to the TPF simply by providing a "default" indication, which tells the TPF to use the first accused charging system, the address of which is already preprogrammed into the TPF. This fact must be treated as established in the case. *See* Fed. R. Civ. P. 56(g).

The second portion of the record Huawei points to is an email thread produced by T-Mobile on July 14, 2017, after the close of fact discovery and after Huawei's infringement experts disclosed their reports. *See* Dkt. 260 at 3. The email is highly technical, but because the email was disclosed late,  the Court has reviewed the email thread without the benefit of expert testimony from either party. Although the Court considered the parties' respective arguments regarding what the email suggests, it is possible that the Court has misunderstood the email's content. But the Court's review was from the perspective of a reasonable juror.

While it may be a close call, a reasonable juror could conclude, on the basis of the email, that the accused CRF sends the address information of the first accused charging system to the TPF. T-Mobile and Intervenors are correct that the email appears to refer to an internal laboratory test that T-Mobile conducted, and the test, according to T-Mobile and Intervenors, went wrong. *See* Dkt. 260-3 at TMOBILE_01110254. But infringement can occur in a laboratory, and it only takes one instance of infringement to preclude summary judgment, even if the infringement occurred by mistake.

The substance of the email refers to acronyms, which the Court will not publish in this report, that are associated with the first accused charging system, raising at least a reasonable inference that the first accused charging system is being used during the test. *See id.* at TMOBILE_01110262. The email appears to suggest that charging information is being sent,

8

perhaps inadvertently or by mistake, from the TPF to the first accused charging system. *See id.* This of course only implies that the TPF has the address information of the first accused charging system. As explained above, the TPF may have been preprogrammed with this information.

The question is whether the email suggests that the CRF is sending the TPF address information of the first accused charging system. One sentence in the email arguably does. The operator who sent the email states that when he uses a "credit control group" identified by an acronym associated with the first accused charging system, the "PCRF [CRF] explicitly redirect[s] to OCC." *Id.* "OCC" stands for "online charging control," and the parties appear to agree that OCC is a charging system. Two inferences could be drawn from this sentence. First, "OCC" refers to the first accused charging system because the email references acronyms associated with that system. *See id.* Second, by "explicitly redirect[ing]" to the first accused charging system, the CRF is providing address information of the first accused charging system to the TPF. Whether these two inferences should be drawn is a question for the trier of fact, but construing all disputed facts in Huawei's favor the Court must conclude that the email precludes summary judgment.

T-Mobile and Intervenors contend that the OCC is not the first accused charging system but rather a test charging system that T-Mobile uses in the laboratory. Huawei appears to argue otherwise. T-Mobile also contends that the email does not indicate that the CRF provides address information of the first accused charging system, but it is at least arguably reasonable to conclude that by using the word "redirect," address information is provided. Accordingly, the motion for summary judgment should be denied, subject to the Rule 56(g) finding discussed above.

### 3.   T-Mobile and Nokia's Motion for Summary Judgment of Exhaustion of the '575 Patent, Dkt. 249

T-Mobile and Nokia move for summary judgment that Huawei's rights to enforce claims of the '575 patent against T-Mobile are exhausted because Huawei granted a third party a license

to the '575 patent, and the sale of the accused Charging Rules Function (CRF) network element was made pursuant to that license. Thus, the sale was in effect authorized by Huawei. *See* Dkt. 249; *see also Impression Prod., Inc. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523, 1535 (2017). Because the agreement between Huawei and the third party (the "third-party agreement")[2] was not timely disclosed as a basis for T-Mobile and Nokia's exhaustion defense, and the error is not substantially justified or harmless, the agreement cannot support T-Mobile and Nokia's motion. Accordingly, the motion for summary judgment should be denied.

Huawei served T-Mobile with an interrogatory requesting that T-Mobile "[s]et forth the complete basis for each of your affirmative defenses in this matter." Dkt. 261-5 at 38. On November 1, 2016, T-Mobile responded primarily with objections, including an objection stating that because T-Mobile had a motion to dismiss pending, "T-Mobile has not yet filed any affirmative defenses." *Id.* at 38-39. On December 2, 2016, T-Mobile supplemented its response as follows:

> Huawei's claims of patent infringement are barred by the doctrines of patent exhaustion and/or implied license because, by way of example, NSN US and the customers or end users of NSN US's equipment were authorized to make, use, sell, and/or offer to sell products embodying the asserted claims of the Asserted Patents under the terms of license agreements with Huawei.

Dkt. 261-6 at 90. Notably, although this response mentions license agreements "with Huawei," there is no reference to any third party. On May 12, 2017, fact discovery closed, and any motions to compel discovery were due. Dkt. 198 at 3.

Two weeks later, on May 26, 2017, T-Mobile served its sixth supplemental interrogatory response, which for the first time identified the third-party agreement and explained how

---

[2] To avoid reference to information designated by the parties as confidential, the Court will refer to the agreement between Huawei and the third party simply as the "third-party agreement."

agreement supported the exhaustion defense. Dkt. 275-2 at 6.[3] Expert disclosures were due four days later, on May 30. Dkt. 198 at 3. T-Mobile and Nokia now move for summary judgment that claims of the '575 patent were exhausted, and their motion is based solely on the third-party agreement.

Rule 26 requires a party who has responded to an interrogatory to supplement its response "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1). A party that fails to do so "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In evaluating whether a violation of Rule 26 is harmless, the Fifth Circuit considers four factors: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Texas A & M Research Found. v. Magna Transp.*, 338 F.3d 394, 402 (5th Cir. 2003).

The third-party agreement is unquestionably important, as the evidence could support an exhaustion defense that would preclude a finding of liability for any infringement of the '575 patent. *See Allergan, Inc. v. Teva Pharm. USA, Inc.*, No. 2:15-CV-1455-WCB, 2017 WL 1512334, at *5 (E.D. Tex. Apr. 27, 2017) (Bryson, J., sitting by designation) (importance of the evidence factor requires "a pragmatic judgment as to the likelihood" that the evidence will support a successful defense). The prejudice to Huawei, however, is substantial, and it arises from two circumstances. First, the third-party agreement was not disclosed as a basis for T-Mobile and Intervenors' exhaustion defense until after the close of fact discovery, which precluded Huawei

---

[3] Although T-Mobile and Nokia suggest that the third-party agreement may have been identified in the third through fifth supplemental interrogatory responses, only the sixth supplemental response is in the record as far as the Court can tell.

from pursuing discovery from the third party and other discovery that may have been relevant to the terms of the agreement. Second, a provision in the license suggests that the contract should be construed under Swiss law, and Huawei did not have sufficient notice to explore this aspect of the agreement, nor did Huawei have time to engage a Swiss law expert because the interrogatory was supplemented only a few days before expert disclosures were due. As for the third factor, any continuance would delay trial, which is only weeks away. *S&W Enters., L.L.C. v. SouthTrust Bank of Ala., N.A.*, 315 F.3d 533, 537 (5th Cir. 2003) (affirming district court's refusal to grant continuance when it would "unnecessarily delay the trial"). Finally, T-Mobile and Intervenors do not explain why the interrogatory response was not supplemented earlier. Although it is not clear when Huawei produced the agreement, presumably it was well before the close of fact discovery. The relevant factors weigh in favor of precluding T-Mobile and Intevenors from relying on the third-party agreement to support their exhaustion defense.

The fact that Huawei may have had notice of the exhaustion defense generally or knowledge of the third-party agreement is irrelevant. The purpose of interrogatories is not only to ascertain facts but also to "determine what the adverse party contends they are, and what purpose they will serve, so that the issues may be narrowed, the trial simplified, and time and expense conserved." *Baim & Blank, Inc v. Philco Distributors, Inc.*, 25 F.R.D. 86, 87 (E.D.N.Y. 1957). Discovery and pretrial procedures "make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 682 (1958). While the Court is not suggesting that T-Mobile and Intervenors' late supplementation was deliberate, the timing of the disclosure, in light of the potential ramifications, justifies exclusion.

Because T-Mobile and Intervenors' motion for summary judgment is based solely on the third-party agreement, the motion should be denied. Additionally, T-Mobile and Intervenors are precluded from using the agreement to support their exhaustion defense at trial or as part of any further motion or proceeding. *See* Fed. R. Civ. P. 37(c)(1).

### 4.   T-Mobile and Nokia's Motion for Partial Summary Judgment of Noninfringement of the '675 and '627 Patents, Dkt. 250

T-Mobile and Nokia move for partial summary judgment of noninfringement of the asserted '675 and '627 patent claims because, according to T-Mobile and Nokia, during the LTE-to-3G handover procedure, one of the accused eNodeBs, or LTE base stations, does not forward data during the handover, which is required by the asserted claims. *See* Dkt. 250.[4] Because a dispute of material fact exists, heavily dependent on witness credibility, the motion should be denied.

T-Mobile and Nokia identify substantial evidence that the accused eNodeB does not forward data during the LTE-to-3G handover procedure, and there is no dispute that data forwarding is required by the asserted claims. Expert and fact witnesses, for example, state that the accused eNodeB is configured *not* to perform data forwarding during an LTE-to-3G handover. *See, e.g.*, Dkt. 250-10 ¶¶ 56-61; Dkt. 250-14 at 91:10-12, 143:5-8, 143:15-144:23; Dkt. 250-15 ¶ 4. There is a comment in the relevant source code, in fact, explaining that a particular instruction "insures that [n]o data forwarding is performed." Dkt. 250-13 at ll. 2221-22.  Huawei attempts to rebut this evidence with mixed success.

At least one dispute precludes summary judgment—the testimony of T-Mobile's Rule 30(b)(6) witness. On a number of occasions during the witness's deposition, he testified that it was

---

[4] To avoid reference to information designated by the parties as confidential, the Court will refer to the accused eNodeB at issue in this motion simply as the "accused eNodeB," even though multiple eNodeBs are accused in the litigation, as are different types of handover procedures.

"his understanding" that if there is "downlink data" to be sent, the data would be forwarded to "the other side," and in the context of the questioning it is at least reasonable to assume the witness was referring to the accused eNodeB during an LTE-to-3G handover. *See* Dkt. 244-1 at 2-3. The witness then changed his testimony, through deposition errata, to clarify that while data forwarding by the accused eNodeB was theoretically possible, this "does not actually occur in T-Mobile's network." *See, e.g.*, *id.* at 2.

The Court denied Huawei's motion to strike the deposition errata, but the Court informed the parties that the witness's original answers could be used for impeachment purposes at trial, a use to which T-Mobile did not object, assuming a proper foundation is laid. *See* Dkt. 353. In light of the witness's original testimony, and subsequent change to that testimony, the Court must be cautious not to make a determination about the credibility of the witness at the summary judgment stage and conclude, for example, that the witness was simply originally mistaken or did not understand the questions. Should the witness's original testimony become an issue at trial, it is for the jury to weigh. *See Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009) (witness credibility may preclude summary judgment).

If the jury discredits the witness's corrected testimony, more weight may be given to Huawei's evidence of alleged infringement, particularly the testimony of Huawei's expert. Whether Huawei's evidence could support a finding of infringement may be addressed after any verdict is reached, but because witness credibility is central to the issue, the Court finds it necessary to exercise caution at this stage. For this reason, T-Mobile and Nokia's motion for partial summary judgment should be denied.

### 5.  T-Mobile and Intervenors' Motion for Summary Judgment that Claims of the '575 and '971 Patents are Invalid Under 35 U.S.C. § 101, Dkt. 252

T-Mobile and Intervenors move for summary judgment that claims 1-3 of the '575 patent and claims 1, 2, and 4 of the '971 patent are invalid under 35 U.S.C. § 101 for failure to recite patent-eligible subject matter. Dkt. 252. For the following reasons, the motion should be denied.

The '575 and '971 patents are generally related to methods of charging customers of a 3GPP packet-switched data network, methods the patents refer to as "flow-based charging." As the patents explain, the prior art included methods of charging customers for their cellular network usage based on the customer's total data usage or time spent on a network. The '575 and '971 patents describe methods allowing network providers to charge users differently for different types of data usage. A user might be charged different rates for using audio, video, and email, for example. *See, e.g.*, '575 patent at 1:19-7:6.

The asserted claims recite particular methods involving interactions between the Charging Rules Function (CRF) and the Traffic Plane Function (TPF). The '575 patent claims are described above in the context of T-Mobile and Intervenors' motion for partial summary judgment of noninfringement. The important limitation for purposes of this motion is again the second limitation, "the CRF providing a Traffic Plane Function (TPF) with the charging rules and address information of a charging system." The '971 patent claims recite further interactions between the CRF and TPF. Claim 1 of the '971 patent recites:

> A method for controlling charging of packet data service, comprising:
>
> receiving, by a Traffic Plane Function (TPF), event triggers to control the TPF from a Charging Rule Function (CRF), wherein the event triggers are determined by the CRF;
>
> determining, by the TPF, whether a request for charging rule is required to be sent to the CRF according to the event triggers; and
>
> sending, by the TPF, the request for charging rule to the CRF, if one or more of the event triggers received from the CRF is met,
>
> wherein the event triggers comprise at least one of a change of a Serving GPRS Support Node (SGSN), a change of a Public Land

> Mobile Network (PLMN), a change of a Radio Access Technology (RAT) type, a change of a Traffic Flow Template (TFT), or a change of Quality of Service (QoS).

Claims 2 and 4 of the '971 patent recite additional limitations that are not critical for this motion. T-Mobile and Intervenors contend that the claims of the '575 and '971 patents fail to recite patent-eligible subject matter, and are thus invalid under § 101.

A patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. The exception is that "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S.Ct. 2107, 2116 (2013) (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S.Ct. 1289, 1293 (2012)). In assessing subject-matter eligibility, a court must "first determine whether the claims at issue are directed to a patent-ineligible concept." *Alice Corp. Pty Ltd. v. CLS Bank Int'l*, 134 S.Ct. 2347, 2355 (2014). If the claims are directed to an ineligible concept, the court must then "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo*, 132 S.Ct. at 1298, 1297).

T-Mobile and Intervenors argue that the claims of the '575 and '971 patents are directed to the abstract idea of determining how to charge a customer for different types of cellular network usage, which, according to T-Mobile and Intervenors, is a "fundamental economic practice" that has become routine in the telecommunications industry. *See* Dkt. 252 at 6 (quoting *Bilski v. Kappos*, 561 U.S. 593, 611 (2010)); *see also* Dkt. 252 at 10. Because the software and any hardware components required by the claims are known or conventional aspects of the 3G network, T-Mobile and Intervenors argue that there is no inventive concept to take the claims away from the abstract idea.

16

T-Mobile and Intervenors' arguments have some appeal, and the arguments draw support from several Federal Circuit decisions finding claims patent-ineligible. The claims of the '575 patent, for example, resemble those found invalid in *OIP Technologies, Inc. v. Amazon.com, Inc.*, which were directed to pricing a product based on how customers respond to offers. *See* 788 F.3d 1359, 1361–62 (Fed. Cir. 2015). Similarly, claims of the '971 patent have some similarity to those invalidated in *Accenture Global Services, GmbH v. Guidewire Software, Inc.*, which were directed to a system for generating tasks involving "a task library database for storing rules for determining tasks to be completed upon an occurrence of an event." *See* 728 F.3d 1336, 1338-39 (Fed. Cir. 2013). The '971 patent claims also resemble those found ineligible in *Smartflash LLC v. Apple Inc.*, 680 F. App'x 977, 978 (Fed. Cir. 2017).

Huawei argues the claims are not abstract because they are narrow and confined to a 3G network environment. *See* Huawei Resp. Br. at 9-10, Dkt. 267. According to Huawei, preemption is the central concern underlying § 101, and "there is no dispute that the claims do not preempt others from implementing billing and charging solutions . . . ." *Id.* at 9. Similarly, Huawei explains that because there is no analog to the CRF and TPF recited in the claims outside the 3G context, the claims cannot be directed to an abstract idea. *Id.* at 10. This, according to Huawei, distinguishes the claims from those found ineligible in past cases.

Huawei's arguments do not engage with Federal Circuit precedent in the same way that T-Mobile and Intervenors do. Huawei is correct that the principle of preemption is relevant to the § 101 inquiry, but "[w]hile preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility." *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015), *cert. denied*, 136 S. Ct. 2511, 195 L. Ed. 2d 841 (2016). In other words, abstractness may be most evident where a claim wholly preempts

application of an idea, but the inverse is not necessarily true. A claim that does not preempt application of an idea may be abstract because it recites ineligible subject matter as defined by *Alice* and its progeny, rendering the preemption inquiry moot. *Id.*

Huawei's argument concerning the CRF and TPF could be made in most any case applying a known fundamental business or economic practice using modern technology. The claims of the '575 patent, for example, are arguably directed to a method of charging a customer for using a cellular communications network, and it may be that the CRF and TPF are capable of performing unique functions in the context of that network—functions that do not occur in any other context. The same is true of a general purpose computer integrated within a network. Applying a known economic concept using a computer within a network requires many functions that would be unnecessary if the same concept were applied in another context, for example using a pencil, paper, and calculator. The point is that like many patentees relying on computer and network components to avoid ineligibility under § 101, Huawei did not invent the CRF or TPF but rather specified a way of implementing those functions to charge users of a cellular network in a different way. *See, e.g.*, *OIP Techs.*, 788 F.3d at 1362-63.

Huawei's argument that the claims are limited to specific processes or machinery is not persuasive. *See* Huawei Resp. Br. at 8, Dkt. 267. Huawei emphasizes that the Federal Circuit has acknowledged that "[t]he abstract idea exception prevents patenting a result where 'it matters not by what process or machinery the result is accomplished.'" *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016) (quoting *O'Reilly v. Morse*, 56 U.S. (15 How.) 62, 113 (1854)). It is true that if a claim recites no particular machinery at all, it may be abstract if it recites ineligible subject matter. But it does not follow that because a claim recites machinery or a process that is unique to a 3G cellular communications network, the claim is necessarily patent-

eligible. In other words, the abstract idea exception is not confined to claims that are agnostic to the machinery used to implement the claim. In sum, the fact that claims may be narrow or limited may not make them any less abstract. *See OIP Techs.*, 788 F.3d at 1362-63.

It is nevertheless difficult to conclude that the claims of the '575 and '971 patents are directed to an abstract idea. Although Huawei does not persuasively compare the asserted claims to claims surviving a § 101 challenge at the Federal Circuit, Huawei does emphasize the character of the claims and their focus. *See Accenture*, 728 F.3d at 1341; *Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1348 (Fed. Cir. 2016). The claims of the '575 patent are arguably directed to the manner in which the CRF and TPF communicate, particularly that the CRF provides the TPF charging rules and address information of a charging system. The first sentence in the summary of the invention, for example, emphasizes this particular step by describing "[a] method for improving service data flow based charging," which "includes the step of: a CRF providing a TPF with the address information of a charging system." '575 patent at 7:13-16. Similarly, while the '971 patent describes the invention generally as "a method for charging control of packet data service," the manner in which the method is implemented is confined specifically to "monitoring, by a Traffic Plane Function (TPF), an event trigger provided by a Charging Rule Function (CRF); and sending, by the TPF, a charging rule request to the CRF, if the event trigger is met." '971 patent at 6:54-61.

The prosecution history of the patents supports the conclusion that the claims are not necessarily focused on the idea of charging customers based on the type of cellular network usage. During prosecution of the '575 patent, for example, Huawei emphasized that the contribution of the claims was to clarify how the TPF is provided with the charging rules and address of the charging system. The examiner rejected the '575 patent claims under 35 U.S.C. § 102(b) as being

anticipated by a 3GPP standards document. *See* Dkt. 252-5 at HW_TMO_00012310. Huawei explained that the relevant section of the standard document "nowhere speaks to OCSs or offline charging systems (OFCSs), and in particular, does not speak to how TPFs are provided with the address information of associated charging systems." *Id.* at HW_TMO_00012311. Huawei also acknowledged the examiner's suggestion that the claims be amended to "more clearly highlight that the claimed step of the Charging Rules Function (CRF) providing the Traffic Plane Function (TPF) both with charging rules according to an identified charging method and address information of a charging system for applying the charging rules." Dkt. 252-6 at HW_TMO_00012346. Similarly, during prosecution of the '971 patent, Huawei highlighted the particular communication between the CRF and TPF. Huawei distinguished prior art, for example, on the basis that it failed to teach an event trigger that is determined by the CRF and transmitted "from the CRF to TPF to control the TPF." Dkt. 252-7 at HW_TMO_00005243.

The '575 and '971 patents' emphasis on the manner in which the CRF and TPF interact makes the claims arguably similar to those withstanding scrutiny by the Federal Circuit under *Alice* step one. The claims addressed in *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016), for example, were directed to a self-referential software table that improved the computer's functionality, and this focus was evident from both the claim language and the specification. *Id.* at 1337-39. Here too, the '575 and '971 patent claims recite the particular manner in which the CRF and TPF communicate, and this point is emphasized in the specification and prosecution history. Moreover, the claims are arguably similar to the claims in *DDR Holdings, LLC v. Hotels.com, L.P.*, inasmuch as the claims are rooted in 3G network technology and purport to recite a solution to a problem unique to that environment, namely the manner in which the CRF and TPF interact. *See* 773 F.3d 1245, 1256-57 (Fed. Cir. 2014). In this way, the asserted claims are arguably

particularized, like the claims in *DDR Holdings*, and the particularized nature of the claims is an important point of emphasis distinguishing *DDR Holdings* (and *Enfish*) from most other cases. *Id.* at 1259; *see also Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1262 (Fed. Cir. 2017) (Hughes, J., dissenting) ("[W]e must not express the claim's fundamental concept at an inappropriate level of abstraction but at a level consistent with the level of generality or abstraction expressed in the claims themselves.").

The claims are similar to those evaluated in *DDR Holdings* in another respect, however, making the step one analysis less certain. Like the claims in *DDR Holdings*, the thrust of the claims is difficult to define with confidence. *See id.* at 1257 (recognizing multiple possible characterizations of the claims). The problem discussed in the specification of the '575 and '971 patents is creating a charging system capable of charging cellular network users based on their type of use, e.g., sending email or using the internet, as opposed to a charging system based solely on the quantity of data used or the time spent on the network. It is not clear if the purported solution recited in the claims, although arguably focused on a particular CRF-TPF interaction, is really nothing more than the application of a conventional business practice in the context of the 3G network. *See, e.g.*, *OIP Techs.*, 788 F.3d at 1361-62. Unlike the claims in *OIP Technologies* and the other cases relied on by T-Mobile and Intervenors, however, concluding that the '575 and '971 patent claims are abstract is more difficult because of the highly technical nature of the claims, and, for lack of a better term, the jargon recited the claims.

As the Federal Circuit has recognized, "there may be close calls about how to characterize what the claims are directed to." *Enfish*, 822 F.3d at 1339. "In such cases, an analysis of whether there are arguably concrete improvements in the recited computer technology could take place under step two." *Id.* This is such a case.

Although the Federal Circuit's decision in *Bascom* evaluated step two in the context of a motion to dismiss, the analysis is helpful. *See* 827 F.3d at 1348. The accused infringer argued that the claims were directed to the abstract concept of filtering content over the internet, while the patent holder insisted that the claims were narrower, directed to a "specific implementation of filtering content set forth in the claim limitations." *Id.* The Federal Circuit recognized that "the claims and their specific limitations do not readily lend themselves to a step-one finding that they are directed to a nonabstract idea," much like the claims in this case. *See id.* at 1349. Yet the ordered combination of the claim elements transformed the claims into an inventive concept, at least at the pleading stage, despite the fact that all claim elements were individually well known or conventional. *Id.* at 1349-50.

The '575 and '971 patent claims, even if they are directed to the abstract idea of determining how to charge a customer for usage of a cellular network, recite a particular way of achieving that result. The '575 patent claims recite that the CRF provides the TPF with the charging rules and address information of a charging system. The '971 patent claims recite an even more detailed and specific interaction between the CRF and TPF. A particular relationship between the CRF and TPF is recited in the claims, emphasized in the specification, and was cited as an advance over the prior art during prosecution. As a result, the Court must conclude at the summary judgment stage, where disputed facts must be resolved in favor of the nonmovant, that the claims recite a sufficiently inventive concept—much like the claims at issue in *Bascom*.

Finally, Huawei's preemption argument, although largely irrelevant to step one for the reasons explained by the Federal Circuit in *Ariosa*, informs the step two analysis in another way. The claims in *DDR Holdings* recited "a specific way to automate the creation of a composite web page by an 'outsource provider' that incorporates elements from multiple sources in order to solve

a problem faced by websites on the Internet." 773 F.3d at 1259. Consequently, the claims included "additional features" to "ensure the claims are 'more than a drafting effort designed to monopolize the [abstract idea].'" *Id.* (quoting *Alice*, 134 S.Ct. at 2357). The additional feature of the '575 patent claims is that the CRF provides the TPF with charging rules and address information, and the '971 patent claims recite further limitations concerning the CRF and TPF interaction, which makes the claims different from a claim reciting a generic charging method performed in a routine or conventional way within a 3G network, assuming at this stage that the recited CRF and TPF interactions are not routine or conventional. In other words, the Court cannot conclude at the summary judgment stage that the recited interactions between the CRF and TPF "add nothing of practical significance to the underlying abstract idea," when these interactions, according to the intrinsic evidence, are arguably inventive. *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014).

Ultimately the burden of proving invalidity is T-Mobile's, and regardless of whether the burden for proving invalidity under § 101 is clear and convincing evidence or some lesser burden, the Court cannot comfortably conclude at the summary judgment stage that the asserted claims fail both step one and two. This is because the claims recite particular interactions between the CRF and TPF, and these interactions are emphasized in the specification and prosecution history as a focus of the invention.

It may be determined, as T-Mobile suggests, that the claimed inventions are inherently anticipated or rendered obvious by existing 3G standards technology, but such inquiries are at least superficially distinct from the § 101 inquiry in that anticipation or obviousness requires resolution of disputed material facts.  T-Mobile's motion for summary judgment, however, should be denied.

**6.   T-Mobile and Intervenors' Motion for Summary Judgment of Invalidity of Claim 1 of the '675 Patent, Dkt. 253**

Defendants and Intervenors move for summary judgment that claim 1 of the '675 patent is invalid under 35 U.S.C. § 112, ¶ 1, for failure to provide an adequate written description of the invention. Dkt. 253. Because written description is a question of fact, and because material facts are in dispute, the motion should be denied. The Court does conclude, however, that partial relief under Rule 56(g) should be granted.

Huawei contends that T-Mobile infringes claim 1 and dependent claim 5 of the '675 patent. The '675 patent is generally directed to a method of forwarding data during a handover procedure in which a mobile phone transitions from one radio access network (RAN), e.g., a cell tower, to another RAN while maintaining continuity of a user session. There are different types of RANs, such as a 2G network, which is referred to as a GSM/EDGE Radio Access Network (GERAN), or a 3G network, referred to as a UMTS Territorial Radio Access Network (UTRAN). A 4G or LTE network can be referred to as an Evolved UMTS Territorial Radio Access Network (E-UTRAN).

A handover, or switch between one network and another, may occur between two types of the same network, referred to as an "intra-RAN" handover, or between two different network types, referred to an "inter-RAN" handover. An example of an inter-RAN handover is a transition between an LTE RAN and a 3G RAN. The specification of the '675 patent also refers to an inter-RAN handover as an "intersystem" handover. '675 patent at 13:34-35.

During claim construction, the parties disputed whether two claim terms, the "target side processing network element" and the "source data forwarding network element," necessarily require an inter-RAN handover. In other words, the dispute was whether the target and source network elements could be the same type of RAN. *See, e.g.*, Dkt. 210 at 50, 52-56. The relevant elements are found in claim 1 of the '675 patent, which recites:

A data processing method in a handover procedure, comprising:

exchanging messages, between a Mobility Management network element and a user plane anchor network element, to obtain a data forwarding tunnel identifier of the user plane anchor network element;

informing, by the Mobility Management network element, the user plane anchor network element of a data forwarding tunnel identifier of a *target side processing network element*;

informing, by the Mobility Management network element, *a source data forwarding network element* of the data forwarding tunnel identifier of the user plane anchor network element;

receiving, by the user plane anchor network element, data forwarded by the source data forwarding network element using the data forwarding tunnel identifier of the user plane anchor

network; and

forwarding, by the user plane anchor network element, the data to the target side processing network element.

(emphasis added). T-Mobile argued that the target and source network elements must be a different type of RAN because the specification only discloses inter-RAN handovers, e.g., a handover from a 2G network (GERAN) to a 3G network (UTRAN). *See, e.g.*, 675 patent at 4:6-11. Huawei contended, on the other hand, that the claims were not restricted to inter-RAN handovers because the claim terms themselves are not so clearly limited. The Court acknowledged that "Defendants are correct that the only handovers disclosed in the specification are inter-RAN handovers," but the Court concluded that the disputed term, "target side processing network element," should have its plain and ordinary meaning, and that claim 1 is "not limited to the inter-RAN handovers disclosed in the specification." Dkt. 210 at 52-55.

T-Mobile now argues that Huawei cannot have it both ways. *See* Dkt. 253. Huawei received the broad claim construction it requested, but T-Mobile explains that because the specification never discloses an intra-RAN handover, such as a handover between two LTE RANs, the claims do not comply with the written description requirement of § 112, ¶ 1.

The specification of a patent "shall contain a written description of the invention." § 112, ¶ 1. The written description requirement is satisfied only if the applicant describes the invention, "with all its claimed limitations." *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998) (quoting *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)). The specification must "reasonably convey [ ] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). The "level of detail required . . . varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Id.* The test for sufficiency "requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Id.*

"[T]he hallmark of written description is disclosure." *Id.* The patent must describe an invention in a way that is understandable to a person of ordinary skill in the art to show that the inventor "actually invented the invention claimed." *Id.* The purpose of the written description requirement is to guard against a patentee overreaching beyond the scope of the inventor's technical contribution. *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1319 (Fed. Cir. 2011). Claim construction is integral to any written description analysis, and a district court "must base its analysis of written description under § 112, P 1 on proper claim construction." *Koninklijke Philips Elecs. N.V. v. Cardiac Sci. Operating Co.*, 590 F.3d 1326, 1336 (Fed. Cir. 2010).

Written description is a question of fact, and the party asserting invalidity bears the burden of showing lack of written description by clear and convincing evidence. *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1364 (Fed. Cir. 2003). Inadequate written description is nevertheless amenable to summary judgment "in cases where no reasonable fact finder could

return a verdict for the non-moving party." *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008). Such a determination can be made based solely on a patent's specification. *Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 927 (Fed. Cir. 2004).

T-Mobile frames the dispute as whether the specification adequately describes intra-RAN handovers, *see* Dkt. 253 at 1, but Huawei is correct that the issue is really whether the claim terms, i.e., the source and target networks elements, have been adequately described, *see* Dkt. 264 at 3-4. Yet as T-Mobile accurately points out, claim scope (as informed by claim construction) is integral to the written description inquiry, and there must be written description support for intra-RAN handovers, which is the type of T-Mobile handover Huawei contends is encompassed by claims 1 and 5 of the '675 patent. Put another way, the dispute is whether the '675 patent's general description of the source and target network elements, or the patent's disclosure of the inter-RAN handover species, is sufficient to provide written description support for both inter- and intra-RAN handovers, or the full genus of handovers allegedly encompassed by the claims.

The dispute is similar to the one considered in *Synthes USA, LLC v. Spinal Kinetics, Inc.*, 734 F.3d 1332 (Fed. Cir. 2013). At the plaintiff's urging, the district court construed the phrase "third plate including a plurality of openings" broadly, despite the fact that the specification only disclosed a fiber system anchored through "grooves," as opposed to slots or openings on the plates. *Id.* at 1342-43. The jury was asked to determine whether the disclosure of "grooves" reasonably conveyed to a person of ordinary skill in the art that the inventor had possession of all types of openings, including those of the accused product. *Id.* at 1342. The parties agreed that "grooves" were a species of "opening," but the parties did not agree that "grooves" constituted an adequate disclosure sufficient to allow the patentee to claim all openings. *Id.* The jury found that the claim

lacked written description, and this finding was supported by substantial evidence on appeal, largely on the basis of the patent's specification. *Id.* at 1342-45.

The difference in this case, of course, is that a jury has not yet rendered a verdict. Consequently, the only question at this stage is whether a reasonable juror could find the claims supported by adequate written description, i.e., whether the '675 patent's general disclosure of the source and target network elements or the disclosure of the species of inter-RAN handovers is sufficient for a jury to conclude that intra-RAN handovers are adequately described.

Huawei points to a number of passages in the specification that Huawei contends suffice to overcome summary judgment. Huawei highlights a general discussion of the invention, which is described in the same terms as those used in the claims. *See* '675 patent at 4:20-48. This portion of the specification, however, does not describe intra-RAN handovers. Dr. Jonathan Wells, Huawei's expert, nevertheless relies on such general disclosures to support his opinion that a person of ordinary skill in the art would understand that the inventors were in possession of intra-RAN handovers. Huawei also highlights Figure 11 and related portions of the description, which generally show and describe different types of RANs. *See* '675 patent at Fig. 11, 5:61-6:3, 9:24-44, 9:45-64.  The argument is that a person of ordinary skill in the art would understand that the inventors contemplated mixing and matching different types of RANs.  Dr. Wells appears to rely heavily on Figure 11 and the associated description in concluding that the patent adequately describes an LTE-to-LTE handover. *See, e.g.*, Wells Dep. at 285:8-286:12, Dkt. 264-1. The Court cannot conclude as a matter of law that the patent's general description and the disclosure of the inter-RAN species are both insufficient to provide written description support for the genus of inter- and intra-RAN handovers. The motion for summary judgment should therefore be denied.

A portion of Dr. Wells' deposition testimony is nevertheless concerning. While Dr. Wells acknowledges that the '675 patent does not explicitly describe a RAN handover between two LTE networks, i.e., an intra-RAN handover, Dr. Wells bolsters his conclusion by stating the following:

> But, it does say at the end of the patent that one of ordinary skill in the art can make alterations or modifications without departing from the principles of the present invention, and that these alterations and modifications should be covered within the scope of the present invention.

*Id.* at 287:11-16. The portion of the specification referenced by Dr. Wells is a boilerplate paragraph found in many patents:

> Exemplary embodiments of the present invention are described. It should be noted that those skilled in the art may make various alternations or modifications without departing from the principle of the present invention. The alternations and modifications should be covered within the scope of the present invention.

'675 patent at 17:29-35.

The boilerplate language is insufficient, as a matter of law, to provide adequate written description support for intra-RAN handovers. *See Univ. Of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 923 (Fed. Cir. 2004) ("[G]eneralized language may not suffice if it does not convey the detailed identity of an invention."); *see also Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1343 (Fed. Cir. 2013); *Wireless Agents LLC v. Sony Ericsson Mobile Commc'ns AB*, 189 F. App'x 965, 967 (Fed. Cir. 2006) (ignoring boilerplate language for purposes of claim construction); *Lochner Techs., LLC v. Apple, Inc.*, No. SA 12-CV-1659-MRP, 2013 WL 12171946, at *3 (C.D. Cal. Apr. 24, 2013); *Gen-Probe Inc. v. Becton Dickinson & Co.*, 899 F. Supp. 2d 971, 981 n.10 (S.D. Cal. 2012).

Accordingly, pursuant to Rule 56(g), because the Court finds that the boilerplate language at column 17, lines 29-35 of the '675 patent specification does not adequately describe intra-RAN handovers, and because Dr. Wells' testimony to the contrary would not assist the trier of fact in

resolving the written description dispute inasmuch as Dr. Wells' conclusion is foreclosed by law,

the testimony should be excluded under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals,*

*Inc.*, 509 U.S. 579 (1993).  Further, testimony suggesting that intra-RAN handovers are described

by the boilerplate paragraph risks misleading and confusing the jury as to the proper written

description standard, and this testimony should be prohibited under Rule 403. *See* Fed. R. Evid.

403.

## CONCLUSION

For the foregoing reasons,

It is **RECOMMENDED**: [5]

(1) T-Mobile's motion for summary judgment that Huawei is not entitled to presuit damages,
Dkt. 245, should be <u>granted</u>.

(2) T-Mobile and Intervenors' motion for partial summary judgment of noninfringement with
respect to the '575 patent, Dkt. 248, should be <u>denied</u>. Pursuant to Rule 56(g), however,
the Court should enter an order stating that the CRF does not send "address information"
of the first accused charging system to the TPF simply by providing a "default" indication,
which tells the TPF to use the first charging system, the address of which is already
preprogrammed into the TPF.

(3) T-Mobile and Nokia's motion for summary judgment that Huawei's rights under the '575
patent are exhausted, Dkt. 249, should be <u>denied</u>.

---

[5] A party's failure to file written objections to the findings, conclusions, and recommendations
contained in this report within fourteen days after being served with a copy shall bar that party
from de novo review by the district judge of those findings, conclusions, and recommendations
and, except on grounds of plain error, from appellate review of unobjected-to factual findings, and
legal conclusions accepted and adopted by the district court. Fed. R. Civ. P. 72(b)(2); *see Douglass
v. United Servs. Auto. Ass'n.*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

(4) T-Mobile and Nokia's motion for partial summary judgment of noninfringement of the '675 and '627 patents, Dkt. 250, should be <u>denied</u>.

(5) T-Mobile and Intervenors' motion for summary judgment that claims of the '575 and '971 patents are invalid under 35 U.S.C. § 101, Dkt. 252, should be <u>denied</u>.

(6) T-Mobile and Intervenors' motion for summary judgment that claim 1 of the '675 patent is invalid for lack of written description, Dkt. 253, should be <u>denied</u>.  However, the Court should enter an order prohibiting any evidence or argument that the boilerplate language in the '675 patent at column 17, lines 29-35, is sufficient to provide written description of intra-RAN handovers.

**SIGNED this 15th day of October, 2017.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE